# Exhibit 2 to Schedule of Actions

ACCO,(AJWx),DISCOVERY,MANADR,RELATED-G

# UNITED STATES DISTRICT COURT for the CENTRAL DISTRICT OF CALIFORNIA (Western Division - Los Angeles)
## CIVIL DOCKET FOR CASE #: 2:16-cv-01378-CAS-AJW

Gordon Feller et al v. Transamerica Life Insurance Company
Assigned to: Judge Christina A. Snyder
Referred to: Magistrate Judge Andrew J. Wistrich
Related Case: 2:15-cv-03238-CAS-VBK
Cause: 28:1332 Diversity-Breach of Contract

Date Filed: 02/28/2016
Jury Demand: Plaintiff
Nature of Suit: 110 Insurance
Jurisdiction: Diversity

**Plaintiff**

**Gordon Feller**
*on behalf of himself and all others
similarly situated*

represented by **Andrew S Friedman**
Bonnett Fairbourn Friedman and Balint
PC
2325 East Camelback Road Suite 300
Phoenix, AZ 85016
602-274-1100
Fax: 602-274-1199
Email: afriedman@bffb.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gerald Sinclair Flanagan**
Consumer Watchdog
2701 Ocean Park Boulevard Suite 112
Santa Monica, CA 90405
310-392-2632
Fax: 310-392-8874
Email: Jerry@consumerwatchdog.org
*ATTORNEY TO BE NOTICED*

**Travis Murray Corby**
Shernoff Bidart Escheverria Bentley
LLP
301 North Cannon Drive Suite 200
Beverly Hills, CA 90210
310-246-0503
Fax: 310-246-0380
Email: tcorby@shernoff.com
*ATTORNEY TO BE NOTICED*

**William M Shernoff**
Shernoff Bidart Escheverria Bentley

LLP
600 South Indian Hill Boulevard
Claremont, CA 91711
909-621-4935
Fax: 909-447-2043
Email: wshernoff@shernoff.com
*ATTORNEY TO BE NOTICED*

**Harvey Rosenfield**
Consumer Watchdog
2701 Ocean Park Boulevard Suite 112
Santa Monica, CA 90405
310-392-0522
Fax: 310-392-8874
Email: harvey@consumerwatchdog.org
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Mary Feller**
*on behalf of herself and all others
similarly situated*

represented by **Andrew S Friedman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gerald Sinclair Flanagan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Travis Murray Corby**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William M Shernoff**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Harvey Rosenfield**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**George N Zacharia**
*on behalf of himself and all others
similarly situated*

represented by **Andrew S Friedman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gerald Sinclair Flanagan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Travis Murray Corby**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William M Shernoff**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Harvey Rosenfield**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Margaret Zacharia**
*on behalf of herself and all others
similarly situated*

represented by **Andrew S Friedman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gerald Sinclair Flanagan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Travis Murray Corby**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William M Shernoff**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Harvey Rosenfield**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

<u>**Defendant**</u>

**Transamerica Life Insurance
Company**

represented by **Dan E Marmalefsky**
Morrison and Foerster LLP
707 Wilshire Boulevard Suite 6000
Los Angeles, CA 90017-3543
213-892-5200
Fax: 213-892-5454
Email: dmarmalefsky@mofo.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nancy R Thomas**
Morrison and Foerster LLP
707 Wilshire Boulevard Suite 6000
Los Angeles, CA 90017-3543
213-892-5200
Fax: 213-892-5454
Email: nthomas@mofo.com
*ATTORNEY TO BE NOTICED*

**Sylvia Rivera**
Morrison and Foerster LLP
707 Wilshire Boulevard Suite 6000
Los Angeles, CA 90017-3543
213-892-5200
Fax: 213-892-5454
Email: srivera@mofo.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/28/2016 | 1 | COMPLAINT Receipt No: 0973-17362931 - Fee: $400, filed by Plaintiffs Margaret Zacharia, Gordon Feller, George N Zacharia, Mary Feller. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G) (Attorney Harvey Rosenfield added to party Gordon Feller(pty:pla), Attorney Harvey Rosenfield added to party Mary Feller(pty:pla), Attorney Harvey Rosenfield added to party George N Zacharia (pty:pla), Attorney Harvey Rosenfield added to party Margaret Zacharia (pty:pla))(Rosenfield, Harvey) (Entered: 02/28/2016) |
| 02/28/2016 | 2 | CIVIL COVER SHEET filed by Plaintiffs Gordon Feller, Mary Feller, George N Zacharia, Margaret Zacharia. (Rosenfield, Harvey) (Entered: 02/28/2016) |
| 02/28/2016 | 3 | Request for Clerk to Issue Summons on Complaint (Attorney Civil Case Opening,, 1 filed by Plaintiffs Gordon Feller, Mary Feller, George N Zacharia, Margaret Zacharia. (Rosenfield, Harvey) (Entered: 02/28/2016) |
| 02/28/2016 | 4 | NOTICE of Related Case(s) filed by Plaintiffs Gordon Feller, Mary Feller, George N Zacharia, Margaret Zacharia. Related Case(s): 15CV03238 (Rosenfield, Harvey) (Entered: 02/28/2016) |
| 02/28/2016 | 5 | NOTICE of Interested Parties filed by Plaintiffs Gordon Feller, Mary Feller, George N Zacharia, Margaret Zacharia, (Rosenfield, Harvey) (Entered: 02/28/2016) |
| 02/29/2016 | 6 | NOTICE OF ASSIGNMENT to District Judge Dale S. Fischer and Magistrate Judge Andrew J. Wistrich. (esa) (Entered: 02/29/2016) |
| 02/29/2016 | 7 | NOTICE TO PARTIES OF COURT-DIRECTED ADR PROGRAM filed. (esa) (Entered: 02/29/2016) |
| 02/29/2016 | 8 | |

| | | |
|---|---|---|
| | | 21 DAY Summons issued re Complaint 1 as to defendant Transamerica Life Insurance Company. (esa) (Entered: 02/29/2016) |
| 02/29/2016 | 9 | NOTICE OF FILING FEE DUE on Pro Hac Vice Application mailed to attorney Andrew S. Friedman for Plaintiffs Gordon Feller, Mary Feller, George N Zacharia, Margaret Zacharia. Pro Hac Vice application has not been received by the court. Please return your completed Application of Non-Resident Attorney to Appear in a Specific Case, form G-64, or a copy of the Notice of Electronic Filing of your application and the $325.00 fee and this notice immediately. Out-of-state federal government attorneys who are not employed by the U.S. Department of Justice are required to file a Pro Hac Vice application;no filing fee is required. You have been removed as counsel of record from this case for failure to submit this filing fee. (esa) (Entered: 02/29/2016) |
| 02/29/2016 | 10 | NOTICE OF FILING FEE DUE on Pro Hac Vice Application mailed to attorney Francis J. Balint, Jr for Plaintiffs Gordon Feller, Mary Feller, George N Zacharia, Margaret Zacharia. Pro Hac Vice application has not been received by the court. Please return your completed Application of Non-Resident Attorney to Appear in a Specific Case, form G-64, or a copy of the Notice of Electronic Filing of your application and the $325.00 fee and this notice immediately. Out-of-state federal government attorneys who are not employed by the U.S. Department of Justice are required to file a Pro Hac Vice application;no filing fee is required. You have been removed as counsel of record from this case for failure to submit this filing fee. (esa) (Entered: 02/29/2016) |
| 03/01/2016 | 11 | ORDER RE TRANSFER PURSUANT TO GENERAL ORDER 14-03 -Related Case- filed. Related Case No: 2:15-cv-03238 CAS(VBKx). Case transferred from Judge Dale S. Fischer to Judge Christina A. Snyder for all further proceedings. The case number will now reflect the initials of the transferee Judge 2:16-cv-01378 CAS(AJWx). Signed by Judge Christina A. Snyder (rn) (Entered: 03/01/2016) |
| 03/01/2016 | 12 | INITIAL STANDING ORDER upon filing of the complaint by Judge Christina A. Snyder. If a party would be entitled to attorneys fees, counsel are referred to the Order Re Fees found on Court's website under Judge Fischer's Procedures and Schedules contained in the Judge's Requirements tab. Read all Orders carefully. They govern this case and differ in some respects from the Local Rules. (pso) (Entered: 03/01/2016) |
| 03/01/2016 | 13 | NOTICE OF CLERICAL ERROR: Due to clerical error Re: INITIAL STANDING ORDER OF JUDGE FISCHER 12 was docketed in error. Document was issued and docketed in error. The case has been transferred from Judge Fischer to Judge Snyder. (pso) (Entered: 03/01/2016) |
| 03/21/2016 | 14 | APPLICATION for attorney Andrew S. Friedman to Appear Pro Hac Vice (PHV Fee of $325 receipt number 0973-17499767 paid.) filed by Plaintiffs Gordon Feller, Mary Feller, George N Zacharia, Margaret Zacharia. (Attachments: # 1 Certificate of Good Standing, # 2 Proposed Order) (Rosenfield, Harvey) (Entered: 03/21/2016) |
| 03/24/2016 | 15 | |

|  |  | ORDER ON APPLICATION OF NON-RESIDENT ATTORNEY TO APPEAR IN A SPECIFIC CASE PRO HAC VICE by Judge Christina A. Snyder: granting 14 APPLICATION to Appear Pro Hac Vice by Attorney Andrew S. Friedman on behalf of Plaintiffs, designating Harvey Rosenfield as local counsel. (lt) (Entered: 03/24/2016) |
|---|---|---|
| 03/29/2016 | 16 | PROOF OF SERVICE Executed by Plaintiff Margaret Zacharia, Gordon Feller, George N Zacharia, Mary Feller, upon Defendant Transamerica Life Insurance Company served on 3/17/2016, answer due 4/7/2016. Service of the Summons and Complaint were executed upon Transamerica Life Insurance Company in compliance with statute not specified by personal service.Original Summons NOT returned. (Friedman, Andrew) (Entered: 03/29/2016) |
| 03/31/2016 | 17 | NOTICE of Appearance filed by attorney Dan E Marmalefsky on behalf of Defendant Transamerica Life Insurance Company (Attorney Dan E Marmalefsky added to party Transamerica Life Insurance Company(pty:dft)) (Marmalefsky, Dan) (Entered: 03/31/2016) |
| 03/31/2016 | 18 | NOTICE of Appearance filed by attorney Sylvia Rivera on behalf of Defendant Transamerica Life Insurance Company (Attorney Sylvia Rivera added to party Transamerica Life Insurance Company(pty:dft))(Rivera, Sylvia) (Entered: 03/31/2016) |
| 03/31/2016 | 19 | CERTIFICATE of Interested Parties filed by Defendant Transamerica Life Insurance Company, identifying Transamerica International Holdings, Inc., AEGON USA, LLC, AEGON U.S. Holding Corporation, Transamerica Corporation, AEGON N.V., Transamerica Life Insurance Company. (Attorney Nancy R Thomas added to party Transamerica Life Insurance Company (pty:dft))(Thomas, Nancy) (Entered: 03/31/2016) |
| 03/31/2016 | 20 | STIPULATION Extending Time to Answer the complaint as to Transamerica Life Insurance Company answer now due 5/9/2016, re Complaint (Attorney Civil Case Opening),, 1 filed by Defendant Transamerica Life Insurance Company.(Thomas, Nancy) (Entered: 03/31/2016) |
| 04/06/2016 | 21 | CERTIFICATE of Interested Parties filed by Defendant Transamerica Life Insurance Company, identifying Transamerica Life Insurance Company, Gordon and Mary Feller, George and Margaret Zacharia, Commonwealth General Corporation, Transamerica Corporation, The AEGON Trust, AEGON International B.V., AEGON N.V.. (Thomas, Nancy) (Entered: 04/06/2016) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 05/03/2016 10:11:21 | | | |
| PACER Login: | mf0071:2595675:3945828 | Client Code: | 16157-0000068-05690 |
| Description: | Docket Report | Search Criteria: | 2:16-cv-01378-CAS-AJW End date: 5/3/2016 |
|  |  |  |  |

| Billable Pages: | 6 | Cost: | 0.60 |
|---|---|---|---|

1

**CONSUMER WATCHDOG**
Harvey Rosenfield (SBN: 123082)
Jerry Flanagan (SBN: 271272)
2701 Ocean Park Blvd., Suite 112
Santa Monica, CA 90405
Tel: (310) 392-0522
Fax: (310) 392-8874
harvey@consumerwatchdog.org
jerry@consumerwatchdog.org

[Additional Counsel on Signature Page]

*Attorneys for Plaintiffs and the Classes*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| GORDON AND MARY FELLER, and GEORGE AND MARGARET ZACHARIA, on behalf of themselves and all others similarly situated, | Case No. |
| Plaintiffs, | **CLASS ACTION COMPLAINT DEMAND FOR JURY TRIAL** |
| vs. | 1. Breach of Contract |
| | 2. Breach of the Implied Covenant of Good Faith and Fair Dealing |
| TRANSAMERICA LIFE INSURANCE COMPANY, | 3. Breach of Duty of Good Faith and Fair Dealing |
| Defendant. | 4. Injunctive and Restitutionary Relief pursuant to Cal. Bus. & Prof. Code §17200, *et seq.* |
| | 5. Declaratory Relief |
| | 6. Preliminary and Permanent Injunctive Relief |
| | 7. Elder Abuse pursuant to Cal. Wel. & Inst. Code §15657.5, *et seq.* |

**CLASS ACTION COMPLAINT**

1    Plaintiffs, by and through the undersigned attorneys, bring this action on
2 behalf of themselves and all others similarly situated against Defendant
3 Transamerica Life Insurance Company. Plaintiffs allege the following on
4 information and belief, except as to those allegations that pertain to the named
5 Plaintiffs, which are alleged on personal knowledge.

6                            **NATURE OF THE ACTION**

7    1.    In the late 1980s and early 1990s, Transamerica sold universal life
8 insurance policies under which it agreed to credit interest on policyholders'
9 accounts at a guaranteed rate of no less than 5.5% annually and similar policies
10 with other guaranteed rates. Plaintiffs bought such policies so that they and their
11 families would be protected as they entered their senior years. Yet Transamerica
12 in August 2015 suddenly, unilaterally and massively increased the monthly
13 deductions withdrawn from Plaintiffs' accumulation accounts by 38%, falsely
14 stating that the increase was permitted by the terms of their policies. However,
15 Transamerica's true reasons for the premium increase were to subsidize its cost of
16 meeting its interest guarantee, to recoup past losses on the policies and on its
17 investment portfolio, and to make the policies more profitable by inducing policy
18 terminations by those policyholders who could not afford the increase.

19    2.    Plaintiffs in this action seek damages and equitable relief to reverse
20 Transamerica's massive increase in the monthly deduction withdrawn from their
21 accounts each month, which has injured Plaintiffs and which, if allowed to
22 proceed, will cause irreparable injury to Plaintiffs and other members of the
23 putative Classes (collectively, the "Class Members"). As further described below,
24 Transamerica's sudden and unilateral increase in the premiums required to keep
25 these policies in force constitutes a breach of its express and implied obligations
26 under the policies, a violation of the unlawful and unfair prongs of California's
27 Unfair Competition Law ("UCL"), and a violation of California's Elder Abuse
28 Statutes.

## THE PARTIES

3.     Plaintiffs Gordon Feller and Mary Feller (collectively, "Feller") are husband and wife, and at all times herein mentioned, were citizens of the State of California. On or about September 13, 1989, Transamerica Occidental Life Insurance Company from its Los Angeles office issued to Feller an adjustable universal life insurance policy (Policy No. 9229114) with a face amount of $500,000.

4.     Plaintiffs George N. Zacharia and Margaret Zacharia (collectively, "Zacharia") are husband and wife, and at all times herein mentioned were citizens of the State of California.   On or about December 20, 1990, Transamerica Occidental Life Insurance Company from its Los Angeles office issued an adjustable universal life insurance policy (Policy No. 92332828) with a face amount of $250,000, which was subsequently transferred into a revocable *inter vivos* trust over which Zacharia, as the settlor, holds the power to revoke. Zacharia retains full ownership and control over the policy under California law.

5.     Defendant Transamerica Life Insurance Company ("TLIC") is a corporation organized under Iowa law, with its principal place of business at 4333 Edgewood Road NE, Cedar Rapids, Iowa, 52499.  TLIC is thus a citizen of Iowa.

6.     Transamerica Occidental Life Insurance Company ("TOLIC") was in 1989 and 1990 a corporation organized under California law, with its Home Office and principal place of business at 1150 S. Olive Street, Los Angeles, California, 90015.

7.     On or about October 1, 2008, TOLIC was merged into TLIC, making TLIC its successor-in-interest. TOLIC and TLIC are herein collectively referred to as "Transamerica."

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over the parties to this action. The four named Plaintiffs are residents of California, Transamerica transacts business in

2

CLASS ACTION COMPLAINT

1  California, and many thousands of the Class Members are resident citizens of
2  California.

3       9.    Jurisdiction over Transamerica is also proper because it has
4  purposely availed itself of the privilege of conducting business activities in
5  California and because it currently maintains systematic and continuous business
6  contacts with this State.

7       10.    Venue is proper in this District under 28 U.S.C. § 1391 because
8  Transamerica maintains substantial operations in this District; many thousands of
9  Class Members either reside or did business with Transamerica in this District;
10  Transamerica engaged in business in this District; a substantial part of the events
11  or omissions giving rise to the claims at issue occurred in this District; and
12  Transamerica entered into transactions and received substantial profits from
13  policyholders who reside in this District.

14       11.    This Court has subject matter jurisdiction based on diversity of
15  citizenship. Plaintiffs allege subject matter jurisdiction based on the Class Action
16  Fairness Act, 28 U.S.C. §1332(d).

17  **FACTUAL ALLEGATIONS**

18  **The Standardized Policy Terms**

19       12.    Plaintiffs bring this class action on behalf of themselves and other
20  owners and former owners of certain universal life insurance policies issued and
21  administered by Transamerica (the "Policies").[1] The Policies use standardized,
22  materially uniform language with respect to the policy provisions at issue in this
23  action.

24  _____

25  [1] The Policies include the so-called "TransMax" policies issued to Plaintiffs, as
well as all other policies issued by Transamerica that share comparable terms and
26  for which Transamerica has unilaterally increased monthly deductions since
27  August 1, 2015. A specimen copy of the standardized Policy contract, as issued to
Zacharia, is attached as Exhibit "A."
28

3

CLASS ACTION COMPLAINT

13.    Under the uniform provisions of the Policies, an "accumulation account" is established for each Policy, into which the Policyholder's premium payment(s) are deposited. The accumulation account earns interest at a guaranteed interest rate specified in the Policy. Certain of the   Policies provide that Transamerica will pay guaranteed interest at the rate of 4%, and that the accumulation value on any policy anniversary will never be less than as if 5.5% interest was credited annually from the issue date. Others contain similar interest rate guarantees.

14.    At the end of each policy month, Transamerica withdraws an amount ("Monthly Deduction") from the Policy's accumulation account. The Monthly Deduction is equal to the following: (a) the application of a "Monthly Deduction Rate" to the difference between the death benefit and the accumulation value at the beginning of the year; and (b) the monthly deduction for any policy riders; and (c) a policy fee.

15.    The Monthly Deduction Rate is by far the most important component of the Monthly Deduction charge.  Even small changes in the Monthly Deduction Rate can produce a dramatic increase in the dollar amount of the Monthly Deduction charged by Transamerica. The higher the Monthly Deduction Rate, the greater the premiums required to maintain a positive balance in the accumulation account and avoid a lapse of the Policy.

16.    Under the Policies, Transamerica determines the Monthly Deduction Rates for each policy year at the beginning of that policy year, using the insured's age as of that policy year.  The guaranteed Monthly Deduction Rate for non-smokers is premised on a "cost of insurance" ("COI") portion or component, which is in turn based on projections of life span established by the 1980 CSO Mortality Tables.  The guaranteed Monthly Deduction Rate for smokers is premised on the same COI rates, plus an added "expense" portion or component.

17.    Under the Policies, Transamerica's discretion to set or increase the

1   Monthly Deduction Rates is therefore constrained by the Tables of Guaranteed
2   Monthly Deduction Rates and the attained age of the insured under the Policy.

3       18.    Furthermore, the Policies do not expressly authorize Transamerica to
4   do any of the following:

5       • Set or increase the Monthly Deduction Rates in whatever amount or by
6           whatever method it determines;

7       • Set or increase Monthly Deduction Rates to recoup past losses on the
8           Policies due to the failure of credited interest, policy lapse rates or other
9           assumptions Transamerica made when originally pricing the Policies;

10      • Set or increase Monthly Deduction Rates to recoup losses on the Policies
11          due to diminished returns on Transamerica's general investment
12          portfolio; and

13      • Set or increase Monthly Deduction Rates in order to negate or offset
14          Transamerica's obligation to pay credited interest to the Policies at the
15          minimum guaranteed rates.

16      19.    Moreover, a reasonable Policyholder would construe the standardized
17  Policy language to mean that the Monthly Deduction Rate, premised as it is on the
18  purported "cost of insurance" based on the 1980 CSO Mortality Tables, would not
19  change except for an adverse change in the underlying mortality rates. As
20  reflected in every subsequent version of the CSO Mortality Tables, mortality rates
21  have only improved in the years since the Policies were issued from 1987 and
22  1998.

23      20.    In addition, a reasonable Policyholder would construe (a) the
24  Policies' provisions governing the payment of interest on the accumulation
25  account (subject to their unique and specific guarantees under the Policy), and (b)
26  the Policies' provisions governing the Monthly Deduction based on
27  Transamerica's COI (subject to their unique and specific guarantees under the
28  Policies), as operating independently of one another, precluding Transamerica

1  from offsetting or subsidizing its credited interest obligations with increases in the
2  Monthly Deduction Rate.

3      21.    In the alternative, the Policies are at a minimum ambiguous with
4  respect to whether Transamerica can increase the Monthly Deduction for any
5  reason other than an adverse change in mortality rates. As a result, any ambiguity
6  in this respect must be construed against Transamerica and in favor of the
7  Policyholder.

**Transamerica Has Consistently Represented Unchanged
Current Expectations Regarding Future COI**

10     22.    The Monthly Deduction Rate, which Transamerica set at a level less
11 than the Guaranteed Monthly Deduction Rate, is considered a "nonguaranteed
12 element" of the Policy. Insurance companies and their actuaries are required to
13 file with their state regulators answers to interrogatories every year as to whether
14 their "anticipated experience factors underlying any nonguaranteed elements [are]
15 different from current experience."

16     23.    In Transamerica's Statement of Nonguaranteed Elements, as of
17 December 31, 2014, Transamerica expressed no indication of any need to increase
18 the Monthly Deduction Rates due to any adverse change in mortality rates. (*See*
19 Exhibit "B".)

20     24.    Indeed, for each year of the past four years, Transamerica
21 consistently reported to regulators that the anticipated experience factors
22 underlying its nonguaranteed elements were no different than from current
23 experience. (*See* Statement of Nonguaranteed Elements as of December 31, 2013
24 (attached as Exhibit "C"); Statement of Nonguaranteed Elements as of December
25 31, 2012 (attached as Exhibit "D"); Statement of Nonguaranteed Elements as of
26 December 31, 2011 (attached as Exhibit "E").)

27     25.    Moreover, for each of the past five years, Transamerica has engaged
28 in a series of captive reinsurance transactions premised on representations to

CLASS ACTION COMPLAINT

1   regulators and the public that it has retained reserves that are more than sufficient

2   to cover its liabilities, including future COI.  Through such "shadow insurance"

3   transactions, Transamerica has purported to transfer the risks associated with the

4   Policies to its wholly owned captive reinsurance affiliate, thereby claiming a

5   "reserve credit" or release of the purportedly redundant reserves into its reported

6   surplus, which it then used to pay dividends to its parent company.

7       26.    For example, in 2010, Transamerica reported that it had taken reserve

8   credits as a result of reinsurance transactions with affiliated reinsurance

9   companies totalling approximately $30 billion, based on representations that

10   Transamerica had made ample provision to cover the liabilities relating to those

11   policies, including the future COI associated with its universal life policies.

12   During 2010, Transamerica and other affiliated insurance operating companies up-

13   streamed dividends to their ultimate parent holding company, AEGON NV,

14   totalling $2.3 billion.

15   **Transamerica's Massive Monthly Deduction Rate Increase**

16       27.    On June 8, 2015, Transamerica suddenly announced that it was going

17   to unilaterally increase the Monthly Deduction under the Policies, based on a

18   massive increase in the Monthly Deduction Rate ("the MD Rate Increase").

19       28.    Transamerica notified the Policyholders of the MD Rate Increase

20   through a form letter. (*See* Exhibits "F" & "G".)  In that notice letter Transamerica

21   purported to explain "What's Changing and Why." To give the appearance that it

22   was acting on the limited grounds authorized by the Policies, Transamerica

23   represented that it was increasing the Monthly Deduction Rates "based on our

24   current expectations regarding future costs of providing ... coverage [for the

25   Policies]."

26       29.    Transamerica thus acknowledged the limited grounds upon which the

27   Policies permit a MD Rate Increase, and accordingly represented that the MD

28   Rate Increase was premised on an adverse change in the COI portion of the

Monthly Deduction Rate.

30.     Transamerica did not give any other explanation for the MD Rate Increase in the notice letter, and certainly did not suggest that it had the unfettered discretion to increase the Monthly Deduction Rate in whatever amount or by whatever method it determined.

31.     Transamerica began imposing the MD Rate Increase on Policies with an anniversary date of August 1, 2015, at levels of nearly 40% or more.

32.     Pursuant to the MD Rate Increase, Transamerica increased the amount taken from Plaintiffs' accumulation accounts upon their respective Policy's anniversary dates. For example, beginning September 13, 2015, the Fellers suffered an approximately 38% increase in their Monthly Deduction Rates, raising the Monthly Deduction from approximately $1,500 to more than $2,000 in order to maintain the same death benefit for their Policy. The Zacharias similarly suffered an approximately 38% increase in the Monthly Deduction that Transamerica took from their accumulation account beginning December 20, 2015, after the Zacharias reached their 65th birthday.

33.     Plaintiffs and Class Members are now required to pay much higher Monthly Deductions to maintain the same level of coverage under the Policies, such that their Policies will become cost-prohibitive if the MD Rate Increase is not enjoined.  Unless stopped, Transamerica will induce, through its unlawful MD Rate Increase, widespread terminations – known as "shock lapses" – on Policies for which Plaintiffs and Class Members have duly paid the Monthly Deduction for decades.

### The True Reasons for the MD Rate Increase

34.     The sudden and dramatic MD Rate Increase is not in truth based on adverse changes in the "cost of providing coverage" as Transamerica represented in the notice letter to the Policyholders, but rather on Transamerica's desire to avoid its contractual obligation to meet the high interest crediting rates it promised

CLASS ACTION COMPLAINT

1  under the Policies.

2     35.   As explained above, insurance company actuaries are required to
3  closely monitor and report on cost of insurance trends affecting non-guaranteed
4  elements of its insurance policies.   Material deviations between current and
5  expected future expectations as to COI do not occur overnight; they are gradual
6  trends for which actuaries can and do make incremental adjustments.

7     36.   As alleged above, in its annual interrogatory answers to its regulators
8  Transamerica did not report any such adverse changes in its current expectations
9  regarding future costs of insurance.   The true reasons for the sudden and massive
10  RD Rate Increase lay elsewhere.

11     37.   First, since 2007 interest rates have gradually declined to historic
12  lows, adversely impacting insurers given the interest crediting guarantees in the
13  policies.  In the late 1980s, the 10-year Treasury rate was around 9%. The trend of
14  the 10-year Treasury was steadily downward throughout the 1990s, remaining at
15  or above 5% until the post-2001 recession period when it pierced the 4% level for
16  some months. Between 2003 and 2008 it fluctuated generally between 4% and
17  5%. Since mid-2008, however, the 10-year Treasury has been under 4%, hitting a
18  low of 1.65% in 2012.

19     38.   In April 2012, for example, the Center for Insurance Policy &
20  Research ("CIRP") branch of the National Association of Insurance
21  Commissioners published a report describing the effect on insurers of what was,
22  even then, a prolonged period of low level interest rates. (*See* Exhibit "H".) The
23  CIRP Report warned:

24         Life insurance companies face considerable interest rate risk
25     given their investments in fixed-income securities and their unique
       liabilities. For life insurance companies, their assets and liabilities are
26     heavily exposed to interest rate movements. Interest rate risk can
27     materialize in various ways, impacting life insurers' earnings, capital
       and reserves, liquidity and competitiveness. Moreover, the impact of
28

CLASS ACTION COMPLAINT

a low interest rate environment depends on the level and type of guarantees offered. Much of the business currently on life insurers' books could be vulnerable to a sustained low interest rate environment ....

Life insurers typically derive their profits from the spread between their portfolio earnings and what they credit as interest on insurance policies. During times of persistent low interest rates, life insurers' income from investments might be insufficient to meet contractually guaranteed obligations to policyholders which cannot be lowered. ***

In a low interest rate environment, it is challenging to find relatively low-risk, high-yield, long-duration assets to match annuities that guarantee a minimum annual return (e.g., 4%). For many policies, low interest rates mean that some mismatch with assets is likely. For example, older fixed income insurance products that guarantee rates of around 6%—closely matching or conceivably even surpassing current investment portfolio yields—are likely to put a strain on life insurers as a result of spread compression or possibly negative interest margins.

CIPR Report, at 2-3.

39.     Unfortunately, the low interest rate environment has only persisted since 2012, exacerbating the spread compression and thus, as indicated by the CIPR, undermining the profitability of policies with "guarantee rates around 6%."

40.     Transamerica's investment returns have thus been very low since the beginning of the Great Recession, and are nowhere near the returns needed to support continued interest credit to the Policies' accumulation account at the guaranteed 5.5% effective rate. Through the MD Rate Increase, Transamerica seeks to offset or subsidize its credited interest guarantees through dramatically increased Monthly Deductions taken from the Policyholders' accumulation accounts.

41.     The MD Rate Increase is also motivated by Transamerica's desire to make the Policies collectively more profitable by inducing more of them to lapse. When Transamerica priced and sold the Policies, it made a conscious decision to

1  establish a Monthly Deduction Rate schedule that was designed to generate high
2  profits in early durations followed by potential losses in later durations (known as
3  "lapse-supported pricing").[2]  After years of pocketing those profits, Transamerica
4  now seeks to impose the draconian MD Rate Increase to recoup the losses
5  resulting from the way it priced   the rate schedule it now seeks to jettison, even
6  though its mortality experience has only *improved* over the years.

7      42.    Transamerica's stated reason in the notice letters for the MD Rate
8  Increase was false.  As one industry commentator has put it, Transamerica is
9  "trying to claim that mortality charges are the culprit even though you would have
10  to be snoozing pretty heavily not to know that people are living way longer than
11  they were 15 to 20 years ago."[3]

12     43.    Because non-guaranteed elements such as the MD Rate are required
13  to reflect expectations of *future* experience, Transamerica is precluded from re-
14  determining those elements to recoup past losses. To do so would violate the
15  actuarial standards of practice and code of professional ethics.

16     44.    Moreover, Transamerica knows, and fully expects, that the massive
17  MD Rate Increase will cause thousands of Class Members to surrender their
18  Policies and cause thousands of other Policies to lapse as the highly increased
19  Monthly  Deduction  charges  quickly  exhaust  the  funds  in  the  Policies'
20

21  [2] Plaintiffs make this historical reference only to illustrate Transamerica's current
22  motivation for the MD Rate Increase. To be abundantly clear, Plaintiffs in this
    action allege no claim premised on conduct prior to the sale of the Policies;
23  Plaintiffs' claims are instead exclusively premised on Transamerica's actions in
24  imposing the MD Rate Increase beginning in August 2015.

25  [3] Ed Hinerman, *Transamerica Life Drops a Big One in the Punch Bowl!*,
26  Hinerman  Group,  http://www.hinermangroup.com/blog/insurance/transamerica-
    life-drops-a-big-one-in-the-punch-bowl (last checked February 28, 2016).
27
28

1   accumulation accounts.

2       45.    In short, through the sudden and massive MD Rate Increase,
3   Transamerica is attempting to avoid its obligation to credit the guaranteed interest
4   rates under the Policies, to recoup past losses and to shed the Policies by making
5   the premiums to maintain them cost-prohibitive for the Policyholders – thereby
6   frustrating the Policyholders' ability to receive their contractual benefits under the
7   Policies.

8       46.    The Class Members hit hardest by Transamerica's unconscionable
9   business practice are elderly Policyholders who have dutifully paid premiums for
10   20 years or more based on the expectation that in their twilight years the Policies
11   would provide protection for their families. Due to age-related underwriting
12   considerations, life insurance protection for these elderly policyholders is now
13   either unavailable or prohibitively expensive; thus Transamerica's actions have
14   stripped Plaintiffs and the Class of any future life insurance protection.

15      47.    Transamerica's attempt to deprive Plaintiffs and the Class Members
16   of the primary benefit of their Policies – paid for through years of contributions to
17   the accumulation account – violates Transamerica's express and implied
18   obligations under the Policies, amounts to "unlawful" and "unfair" conduct under
19   the UCL, and (in the case of the Zacharias and other Policyholders aged 65 or
20   older) statutory elder abuse.

21      48.    Plaintiffs therefore respectfully seek immediate necessary and
22   appropriate legal and equitable relief to reverse the MD Rate Increase. Unless
23   Transamerica is enjoined, the Policyholders will be irreparably damaged and
24   Transamerica will succeed with its plan to cause mass cancellations of the Policies
25   – leaving tens of thousands of Policyholders without coverage based on an
26   unlawful, unfair and abusive MD Rate increase.

27      49.    Accordingly, Plaintiffs seek damages, declaratory relief and
28   injunctive relief requiring Transamerica to (i) reverse the unlawful increase in

1   Monthly Deductions charged on the Policies, and (ii) reinstate all Policies that

2   were surrendered or lapsed as a result of the MD Rate Increase.

3                          **CLASS ACTION ALLEGATIONS**

4        50.    This action is brought by Plaintiffs individually and on behalf of the

5   five subclasses described below (the "Classes") pursuant to Rule 23, subdivisions

6   (a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure.

7        51.    Plaintiffs seek certification of the following subclasses:

8        **a.    California Subclass I:  Current Policyholders**

9        All California residents who own an in-force Policy for which the

10       Monthly Deduction increase imposed by Transamerica beginning

11       August 1, 2015, has resulted or will result in higher Monthly

12       Deduction charges than those applicable under the rate schedule in

13       effect before that date.

14       **b.    California Subclass II: Surrendered Policyholders**

15       All California residents who previously owned and seek to reinstate a

16       Policy: (i) for which the Monthly Deduction increase imposed by

17       Transamerica beginning August 1, 2015, resulted or threatened to

18       result in higher Monthly Deduction charges than those applicable

19       under the rate schedule in effect before that date; and (ii) that

20       terminated after that date.

21       **c.    California Subclass III:  Senior Policyholders**

22       All California residents who were 65 years old or older and owned a

23       Policy for which the Monthly Deduction increase imposed by

24       Transamerica beginning August 1, 2015, has resulted or will result in

25       higher Monthly Deduction charges than those applicable under the

26       rate schedule in effect before that date.

27       **d.    National Subclass I:  Current Policyholders**

28       All persons, other than California residents, who own a Policy for

which the Monthly Deduction increase imposed by Transamerica beginning August 1, 2015, has resulted or will result in higher Monthly Deduction charges than those applicable under the rate schedule in effect before that date.

**e.    National Subclass II: Surrendered Policyholders**

All persons, other than California residents, who previously owned and seek to reinstate a Policy: (i) for which the Monthly Deduction increase imposed by Transamerica beginning August 1, 2015, resulted or threatened to result in higher Monthly Deduction charges than those applicable under the rate schedule in effect before that date; and (ii) that terminated after that date.

52.    There are thousands of members of each of the Subclasses described in the foregoing Paragraph 44. Accordingly, the Class consists of thousands of consumers of life insurance and is thus so numerous that joinder of all members is impracticable.  The identities and addresses of the members of these Subclasses can be readily ascertained from business records maintained by Transamerica.

53.    The claims asserted by Plaintiffs are typical of the claims of the Class Members.

54.    Plaintiffs are willing and prepared to serve the Court and the proposed Class in a representative capacity. Plaintiffs will fairly and adequately protect the interests of the Class and have no interests that are adverse to, or which materially and irreconcilably conflict with, the interests of the other members of the Class.

55.    The self-interests of Plaintiffs are co-extensive with and not antagonistic to those of absent Class members. Plaintiffs will undertake to represent and protect the interests of absent Class members.

56.    Plaintiff has engaged the services of counsel indicated below who are experienced in complex class litigation and life insurance matters, will adequately

prosecute this action, and will assert and protect the rights of and otherwise represent Plaintiff and absent Class members.

### Rule 23 (b)(2)

57.    This action is appropriate as a class action pursuant to Rule 23 (b)(2). Plaintiffs seek injunctive relief and corresponding declaratory relief for the each of the Classes.  Transamerica has acted in a manner generally applicable to each member of the entire Classes by imposing the MD Rate Increase on all Policies owned by Class Members.

58.    Transamerica's wrongful actions in unlawfully increasing the Monthly Deduction on the Policies, if not enjoined, will subject Plaintiff and Class Members to enormous continuing future harm and will cause irreparable injuries to such Policyholders, who are compelled to surrender valuable life insurance policies with no economically viable option for alternative life insurance. The adverse financial impact of Transamerica's unlawful actions is continuing and, unless preliminarily and permanently enjoined, will continue to irreparably injure Plaintiffs and the Class Members.

### Rule 23 (b)(3)

59.    This action also is appropriate as a class action pursuant to Rule 23 (b)(3) of the Federal Rules of Civil Procedure.

60.    Common questions of law and fact predominate over any individualized questions. Common legal and factual questions include the following:

      a.    Whether Transamerica's actions in hugely and suddenly increasing the Monthly Deductions on the Policies through the MD Rate Increase are authorized under the terms of the Policies;

      b.    Whether Transamerica breached its contractual obligations owing to Plaintiffs and Class Members;

      c.    Whether Transamerica breached its implied duty of good faith and

1      fair dealing owed to Plaintiffs and the Class Members;

2      d.    Whether Transamerica has engaged in unfair or unlawful business

3            practices in its dealings with Plaintiffs and the Class Members;

4      e.    Whether Transamerica has engaged in the financial abuse of elders,

5            within the meaning of California's Elder Abuse Statute;

6      f.    Whether Plaintiffs and the Class Members have been damaged, and if

7            so, are eligible for and entitled to compensatory and punitive

8            damages;

9      g.    Whether Plaintiffs and the Class Members are entitled to declaratory

10           relief; and

11     h.    Whether Plaintiffs and the Class Members are entitled to preliminary

12           and permanent injunctive relief, or other equitable relief, against

13           Transamerica.

14     61.    A class action is superior to other available methods for the fair and

15     efficient adjudication of this controversy, for at least the following reasons:

16     a.    Given the age of the Class Members, many of whom are elderly and

17           have limited resources, the complexity of the issues involved in this

18           action and the expense of litigating the claims, few, if any, Class

19           Members could afford to seek legal redress individually for the

20           wrongs that Transamerica has committed against them, and absent

21           Class Members have no substantial interest in individually

22           controlling the prosecution of individual actions;

23     b.    Once Transamerica's liability has been adjudicated respecting the

24           MD Rate Increase, claims of all Class Members can be determined

25           by the Court;

26     c.    This action will insure an orderly and expeditious administration of

27           the class claims and foster economies of time, effort and expense, and

28           ensure uniformity of decisions and compliance by Transamerica with

16
CLASS ACTION COMPLAINT

1    the Policies;

2    d.    Without a class action, many Class Members would continue to
3    suffer injury, and Transamerica's violations of law will continue
4    without redress while Transamerica continues to reap and retain the
5    substantial proceeds and reductions in its future liabilities derived
6    from its wrongful conduct; and

7    e.    This action does not present any undue difficulties that would impede
8    its management by the Court as a class action.

9    62.    A class action is thus superior to other available means for the fair
10 and efficient adjudication of this controversy. The injuries suffered by individual
11 Class members are, while important to them, relatively small compared to the
12 burden and expense of individual prosecution of the complex and extensive
13 litigation needed to address Transamerica's conduct. Individualized litigation
14 presents a potential for inconsistent or contradictory judgments. By contrast, a
15 class action presents far fewer management difficulties; allows the hearing of
16 claims that might otherwise go unaddressed; and provides the benefits of single
17 adjudication, economies of scale, and comprehensive supervision by a single
18 court.

19         **FIRST CAUSE OF ACTION**

20         *(Breach of Contract – All Classes)*

21    63.    Plaintiffs refer to the prior paragraphs of this Complaint and
22 incorporate those paragraphs as though set forth in full in this cause of action.

23    64.    The Policies are valid, enforceable contracts between Plaintiffs and
24 the Class Members and Transamerica.

25    65.    At all relevant times, Plaintiffs and the Class Members have paid
26 premiums to Transamerica through Monthly Deduction charges under the Policies
27 as established at the inception of the Policies and have otherwise performed all
28 their obligations under the Policies.

66.     As alleged above, Transamerica owed duties and obligations to Plaintiffs and the Class Members under the Policies, including, but not limited to, refraining from imposing Monthly Deduction charges except as authorized under the terms of the Policies.

67.     Transamerica materially breached the terms and provisions of the Policies by increasing the Monthly Deductions effective August 1, 2015, through the MD Rate Increase, for reasons not permitted by the Policies; that is, in order to reduce its credited interest obligations to Plaintiffs and the Class and to recoup past losses, by dramatically depleting the Policyholders' accumulation accounts and forcing mass lapses and surrenders of Policies.

68.     At a minimum, the MD Rate Increase is of such a magnitude that, even if legitimate cost of insurance increases were a factor, Transamerica necessarily considered impermissible factors other than the cost of insurance in setting the level of the MD Rate Increase.

69.     Transamerica's conduct and material breaches of the Policies have proximately caused damages to Plaintiffs and the Class Members in an amount to be determined at trial.

70.     In addition, unless Transamerica is preliminarily and permanently enjoined from continuing to deduct the unlawfully increased Monthly Deduction charges, Plaintiffs and the Class Members will suffer severe and irreparable injuries for which they have no adequate remedy at law.

## SECOND CAUSE OF ACTION

*(Contract Breach of the Implied Covenant of Good Faith and Fair Dealing*

*– California Classes Only)*

71.     Plaintiffs refer to the prior paragraphs of this Complaint and incorporate those paragraphs as though set forth in full in this cause of action.

72.     The Policies are valid, enforceable contracts between Transamerica and Plaintiffs or the Class Members.

18
CLASS ACTION COMPLAINT

73.   Implied in the Policies are contractual covenants of good faith and fair dealing through which Transamerica owed Plaintiffs and the Class Members a duty to act in a manner that did not frustrate their reasonable expectations under the Policies.

74.   Transamerica contractually breached the covenant of good faith and fair dealing because, to the extent Transamerica had the discretion to increase the Monthly Deduction, that discretion was sufficiently constrained under the terms of Policies to support an implied obligation of good faith and fair dealing with respect to the MD Rate Increase.

75.   Transamerica's contractual breach of the covenant of good faith and fair dealing has proximately caused damages to Plaintiffs and the Class Members in an amount to be determined at the time of trial.

76.   In addition, unless Transamerica is preliminarily and permanently enjoined from continuing to deduct the unlawfully increased Monthly Deduction charges, Plaintiffs and the Class Members will suffer severe and irreparable injuries for which they have no adequate remedy at law.

**THIRD CAUSE OF ACTION**

*(Tortious Breach of the Duty of Good Faith and Fair Dealing*

*– California Classes Only)*

77.   Plaintiffs refer to the prior paragraphs of this Complaint and incorporate those paragraphs as though set forth in full in this cause of action.

78.   The Policies are valid, enforceable contracts between Transamerica and Plaintiffs or the Class Members.

79.   Life insurance policies, like those owned by Plaintiffs and the Class Members, protect them from the economic harm and risk presented by death. As is the case with most insurance contracts, the financial interests of Transamerica and the Policyholders are directly at odds: Transamerica benefits from increasing the charges to the Policyholders and the Policyholders are harmed by such

CLASS ACTION COMPLAINT

1   increases. As explained above, Transamerica in particular benefits if Plaintiffs and
2   the Class Members are forced to forfeit the Policies because of its increases of the
3   Monthly Deduction because it will have obtained premium payments without
4   having to pay the death benefits or the promised credited interest rates.

5       80.   For these reasons, Transamerica owes Plaintiffs and the Class
6   Members a heightened duty of good faith and fair dealing. Among other things,
7   Transamerica is required to refrain from doing anything to injure their right to
8   receive the benefits of the Policies.  Transamerica is required to give at least as
9   much consideration to the welfare of the Policyholders as it gives to its own
10  interests. Furthermore, Transamerica has a duty to reasonably inform Plaintiff and
11  the Class Members of their rights and obligations under the Policies.

12      81.   As alleged above, Transamerica has breached these duties in
13  connection with the MD Rate Increase, frustrating the reasonable expectations of
14  Plaintiffs and the Class Members under the Policies and tortiously depriving them
15  of benefits under the Policies.   In increasing the Monthly Deduction,
16  Transamerica did not give proper consideration to the welfare of Plaintiffs and the
17  Class Members and served solely its own interests at their expense. In addition,
18  Transamerica has failed to truthfully, let alone reasonably, disclose or describe its
19  course of conduct, or the basis and reasons for its course of conduct.

20      82.   Transamerica's forgoing alleged acts and omissions were and are
21  unreasonable and without proper cause. If left unabated, Transamerica's conduct
22  will frustrate and deprive Plaintiffs and the Class Members of the reasonably
23  expected benefits of the Policies.

24      83.   Transamerica has in particular improperly withheld benefits due
25  Plaintiffs and the Class Members under the Policies, because the unlawful
26  increase in the Monthly Deduction has both (a) reduced the value of their
27  accumulation account, and (b) reduced the amount of interest credited on their
28  accumulation accounts.

84.    Transamerica's tortious breaches of the covenant of good faith and fair dealing have proximately caused damages to Plaintiffs and the Class Members in an amount to be determined at the time of trial.

85.    Transamerica's conduct was intentional and deliberate and constitutes oppression, fraud, or malice.  Plaintiffs and the Class Members are entitled to recover punitive and exemplary damages in an amount to be determined by the trier of fact.  Plaintiffs also seek an order requiring Transamerica to disgorge all that it received in connection with the above-referenced wrongful acts and omissions.

86.    In addition, unless Transamerica is preliminarily and permanently enjoined from continuing to deduct the unlawfully increased Monthly Deduction charges, Plaintiffs and Class Members will suffer severe and irreparable injuries for which they have no adequate remedy at law.

## FOURTH CAUSE OF ACTION

*(Injunctive and Restitutionary Relief Pursuant to UCL*

*– California Classes Only)*

87.    Plaintiffs refer to the prior paragraphs of this Complaint and incorporate those paragraphs as though set forth in full in this cause of action.

88.    Transamerica committed acts of unfair competition by engaging in the following practices, among others:

a.    Marketing and selling the Policies on the premise that they were a solid and good life insurance product that would provide a certain death benefit for a certain cost and duration and subsequently taking steps to prevent Policyholders from receiving the promised benefits from those Policies by suddenly, massively, and unlawfully increasing the cost of the Policies through the MD Rate Increase.

b.    Imposing the MD Rate Increase even though Transamerica's expected future mortality has improved and is better than the

CLASS ACTION COMPLAINT

1    mortality upon which the original MD Rate schedule is based -- in
2    order to increase premiums, recoup past losses, and/or force its
3    insureds to surrender (cancel) their Policies, all of which was, and is,
4    contrary to, and precluded by, the express terms of the Policies.
5    Thus, the Monthly Deduction charges were increased effective
6    August 1, 2015, so that Transamerica could reduce the size of an
7    unprofitable block of life insurance policies, to eliminate long-
8    anticipated losses on the Policies, and to cause many of the
9    Policyholders to surrender their Policies. Transamerica breached its
10   duties under the Policies by improperly increasing the Monthly
11   Deduction charges in order to recoup past losses and gain or retain an
12   unfair competitive advantage over other life insurers.

13   c.   After the sale of the Policies, continuing to send annual reports,
14        policy servicing statements, illustrations and other documents and
15        correspondence to Plaintiffs and the Class Members without
16        disclosing that there would be sudden, dramatic, and cost-prohibitive
17        increases in the Monthly Deduction charges effective August 1,
18        2015.

19   d.   Failing to provide any meaningful advance warning that it intended
20        to massively and suddenly increase the Monthly Deduction charges
21        effective August 1, 2015, through the MD Rate Increase.

22   e.   Ultimately providing a false and misleading explanation to Plaintiffs
23        and the Class Members of the grounds for the MB Rate Increase.

24   89.   A claim under the UCL's "unlawful" prong can be predicated on any
25   business practice "forbidden by law, be it civil or criminal, federal, state, or
26   municipal, statutory, regulatory, or court made." *Agarwal v. Pomona Valley Med.*
27   *Grp. Inc.*, 476 F.3d 665, 674 (9th Cir. 2007).   Transamerica violated the
28   "unlawful" prong through its alleged misconduct, including the tortious breach of

22
CLASS ACTION COMPLAINT

1    the implied obligation of good faith and fair dealing as alleged above.

2        90.    A claim under the UCL's "unfair" prong is predicated on a "business

3    practice" that "violates established public policy" or is "immoral, unethical,

4    oppressive or unscrupulous and causes injury to consumers which outweighs its

5    benefits." (*Eisen v. Porsche Cars North America, Inc.*, 2012 WL 841019, *5 (C.D.

6    Cal. Feb. 22, 2012) (citing *McKell v. Washington Mut., Inc.*, 142 Cal. App. 4th

7    1457, 1473 (2006).) Transamerica violated the "unfair" prong by excessively

8    raising the Monthly Deduction and the Monthly Deduction Rates for reasons not

9    authorized under the Policies, unfairly shifting to the Plaintiffs and the Class

10   Members (a) losses suffered by Transamerica when the Policies ceased to be as

11   profitable as Transamerica had hoped based on its original (but mistaken) pricing

12   assumptions, and (b) Transamerica's cost of meeting its obligations to pay

13   credited interest at the 4% annual and 5.5% effective guaranteed rates.

14       91.    Plaintiffs are informed and believe and on that basis allege that the

15   "unfair" and "unlawful" practices alleged above are continuing in nature and they

16   are widespread practices engaged in by Transamerica.

17       92.    On behalf of the general public and the Classes, Plaintiffs

18   respectfully requests that the Court issue an injunction against Transamerica

19   preliminarily and permanently enjoining it (i) from continuing to engage in the

20   unlawful and unfair conduct and preventing Transamerica from collecting the

21   unlawfully and unfairly increased Monthly Deduction charges in violation of the

22   Policies and (ii) ordering any Policy to be reinstated that lapsed or terminated as a

23   result of the MD Rate Increase.

24       93.    On behalf of the general public and the Classes, Plaintiffs

25   furthermore respectfully requests that this Court order restitution to be paid by

26   Transamerica to the Classes for Monthly Deduction charges, premiums and other

27   amounts wrongfully required, obtained and collected as the result of the MD Rate

28   Increase in violation of the Policies.

94. Plaintiffs respectfully request an award of attorneys' fees as the prevailing party in his request for injunctive relief and restitutionary relief against Transamerica on behalf of themselves and the Class Members.

## FIFTH CAUSE OF ACTION

### *(For Declaratory Relief – All Classes)*

95. Plaintiffs refer to the prior paragraphs of this Complaint and incorporate those paragraphs as though set forth in full in this cause of action.

96. An actual controversy has arisen and now exists between Plaintiffs and the Class Members, on the one hand, and Transamerica, on the other hand, concerning the respective rights and duties of the parties under the Policies.

97. Transamerica contends that it lawfully and appropriately increased the Monthly Deductions respecting the Policies effective August 1, 2015, through the MD Rate Increase, has appropriately collected (and is still collecting) Monthly Deduction charges based on the elevated Monthly Deduction Rates, and that it is permitted to continue to collect these Monthly Deduction charges in the future for the duration of the Policies. On the other hand, Plaintiffs and the Class Members maintain that Transamerica, effective August 1, 2015, through the MD Rate Increase, has inappropriately and unlawfully, in material breach of the express and implied terms of the Policies, collected inflated Monthly Deduction charges based on the MD Rate Increase.

98. Plaintiffs, for themselves and on behalf of the Classes, seeks a declaration as to the parties' respective rights under the Policies and requests the Court to declare that the MD Rate Increase is unlawful and in material breach of the Policies so that future controversies under the Policies may be avoided.

## SIXTH CAUSE OF ACTION

### *(For Elder Abuse – California Class III Only)*

99. Plaintiffs refer to the prior paragraphs of this Complaint and incorporate those paragraphs as though set forth in full in this cause of action.

24

CLASS ACTION COMPLAINT

1    100.  This cause of action is brought under California's Welfare and
2    Institutions Code section 15610, *et seq.*

3    101.  Plaintiffs George and Margaret Zacharia and each member of
4    California Class III were ages 65 or older at all times relevant to this claim.

5    102.  Transamerica, by seeking to impose the MD Rate Increase took,
6    depleted, appropriated and/or retained the Zacharias' and the Class Members'
7    personal property in bad faith for a wrongful use and/or with intent to defraud,
8    which constitutes financial abuse as defined in Cal. Wel. & Inst. Code section
9    15610.30.

10   103.  Transamerica is guilty of oppression, fraud, and malice in the
11   commission of the above-described acts of abuse. At a minimum, Transamerica
12   knew or should have known that its conduct was likely to be harmful to elders.

13   104.  Under Cal. Civ. Code section 3294 Transamerica is liable to the
14   Zacharias and the Class Members for punitive damages.

15   105.  Under Cal. Wel. & Inst. Code section 15657.5 Transamerica is liable
16   to Zacharia and the Class Members for reasonable attorney fees and costs.

17                              **PRAYER FOR RELIEF**

18   WHEREFORE, Plaintiffs, individually and on behalf of the Class, pray for
19   relief as follows as applicable for the particular cause of action:

20   1.   An Order certifying this action to proceed on behalf of the Class,
21   including the Subclasses, and appointing Plaintiffs and the counsel listed below to
22   represent the Class;

23   2.   An Order awarding Plaintiffs and the Class Members entitled to such
24   relief restitution and/or disgorgement and such other equitable relief as the Court
25   deems proper;

26   3.   An Order enjoining Transamerica, its representatives, and all others
27   acting with it or on its behalf, (a) from using Monthly Deduction Rates based on
28

CLASS ACTION COMPLAINT

1  the MD Rate Increase and (b) from unlawfully charging excessive Monthly

2  Deduction Rates for the Policies and requiring those rates to be at levels that are

3  consistent with the terms of the policies, and other appropriate injunctive relief;

4      4.    An Order providing preliminary and permanent injunctive relief

5  requiring Transamerica, its representatives, and all others acting with it or on its

6  behalf to reinstate any Class Member whose Policy was cancelled or surrendered

7  as a result of the MD Rate Increase;

8      5.    An Order providing a declaration that the MD Rate Increase

9  materially breaches the Policies, and that Transamerica must determine the

10  Monthly Deduction Rates only on the grounds authorized under the Policies;

11      6.    An Order awarding Plaintiffs and the Subclass Members who might

12  be entitled to such relief actual, compensatory, statutory, punitive, and/or

13  exemplary damages;

14      7.    An Order awarding Plaintiffs' attorneys' fees, expert witness fees and

15  other costs pursuant to the state statutory causes of action set forth above that

16  permit such an award; and

17      8.    An Order awarding such other and further relief as may be just and

18  proper, including pre-judgment and post-judgment interest on the above amounts.

19  **DEMAND FOR JURY TRIAL**

20      Plaintiffs demand a jury trial.

21

22  Dated: February 28, 2016.

23                          CONSUMER WATCHDOG

24

25                          By: /s/Harvey Rosenfield
                                Harvey Rosenfield (SBN: 123082)
26                              Jerry Flanagan (SBN: 271272)
                                2701 Ocean Park Blvd., Suite 112
27                              Santa Monica, CA 90405
                                Tel: (310) 392-0522
28

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Fax: (310) 392-8874
Harvey@consumerwatchdog.org
jerry@consumerwatchdog.org

BONNETT, FAIRBOURN,
FRIEDMAN & BALINT, PC
Andrew S. Friedman
(to be admitted *Pro Hac Vice*)
Francis J. Balint, Jr.
(to be admitted *Pro Hac Vice*)
2325 East Camelback Road,
Suite 300
Phoenix, Arizona 85016
Tel: 602-274-1100
Fax: 602-274-1199
afriedman@bffb.com
fbalint@bffb.com

SHERNOFF BIDART
ECHEVERRIA BENTLEY LLP
William M. Shernoff (SBN: 38856)
Travis M. Corby (SBN: 268633)
301 N. Cañon Drive, Suite 200
Beverly Hills, CA 90210
Telephone: (310) 246-0503
Facsimile: (310) 246-0380
wshernoff@shernoff.com
tcorby@shernoff.com

*Attorneys for Plaintiffs and the Classes*



**Transamerica Occidental Life**

Transamerica Occidental
Life Insurance Company
Home Office: Los Angeles, CA

**POLICY FORM   TM-PC**
Individual Life Insurance

| | | |
|---|---|---|
| INSURED | GEORGE N ZACHARIA | 92332828   POLICY NUMBER |
| FACE AMOUNT | $250,000 | DEC 20 1990   DATE OF ISSUE |

While this policy is in force, Transamerica Occidental Life Insurance Company will pay the death benefit to the beneficiary if the Insured dies before the policy anniversary nearest the Insured's age 95, or will pay the net cash value to the owner on the policy anniversary nearest the Insured's age 95 if the Insured is living on that date. All payments are subject to the provisions of this policy.

Signed for the Company at Los Angeles, California, on the date of issue.

EXECUTIVE VICE PRESIDENT, GENERAL COUNSEL
AND CORPORATE SECRETARY

PRESIDENT

**Right to Examine and Return Policy Within 10 Days** -- At any time within 10 days after you receive this policy, you may return it to us or the agent through whom you bought it. We will cancel the policy and void it from the beginning. We will refund to you any premiums paid, less any partial surrenders.

Adjustable Life Insurance
Minimum Premium Requirement
First 5 Policy Years
Thereafter Flexible Premiums
Payable During Life of Insured
To Age 95, Subject to Limitations
Described in the Premiums Provision

Death Benefit Payable at Death of
Insured Before Age 95
Net Cash Value Payable at
Insured's Age 95

Nonparticipating - No Annual Dividends

EXHIBIT A

This policy is a legal contract between you, the Policy Owner, and Transamerica Occidental Life Insurance Company.

### READ YOUR POLICY CAREFULLY

### POLICY SUMMARY

We will pay the death benefit to the Beneficiary if the Insured dies before the policy anniversary nearest age 95.

You must pay at least the minimum premium per year during the first 5 policy years or the policy will lapse. After that, you may vary the amount of premiums and how often you pay them, within certain limits as described in the Premiums Provision. Generally, you may pay premiums as long as the Insured is living. If the Insured is living at the policy anniversary nearest age 95, we will pay the net cash value to you.

Additional benefits, if any, are provided by rider.

This is only a brief description. The insurance is fully described in the various provisions of the policy.

### GUIDE TO POLICY PROVISIONS

|  | Page |
| --- | --- |
| Accumulation Values | 6 |
| Application Copy | after 17 |
| Beneficiary's Rights | 4 |
| Breakdown of Monthly Deductions | 14,15 |
| Cash Value | 7 |
| Change of Beneficiary | 4 |
| Death Benefit | 4 |
| Definitions | 3 |
| Guaranteed Values | 6 |
| Grace Period | 6 |
| Misstatement of Age | 13 |
| Nonforfeiture Options | 8 |
| Ownership Provision | 3 |

|  | Page |
| --- | --- |
| Option to Reduce the Face Amount | 9 |
| Payment of Cash Values and Loans | 13 |
| Payment of Death Benefit | 4 |
| Policy Data | 2,2A,2B |
| Policy Loans | 7 |
| Policy Statements and Illustrations | 13 |
| Premiums | 5 |
| Reinstatement of Lapsed Policy | 6 |
| Riders | after 17 |
| Surrender Option | 8 |
| Table of Guaranteed Monthly Deduction Rates | 2A |
| Table of Surrender Penalties | 11,12 |

This policy is a legal contract between you, the Policy Owner, and Transamerica Occidental Life Insurance Company.

## READ YOUR POLICY CAREFULLY

### POLICY SUMMARY

We will pay the death benefit to the Beneficiary if the Insured dies before the policy anniversary nearest age 95.

You must pay at least the minimum premium per year during the first 5 policy years or the policy will lapse. After that, you may vary the amount of premiums and how often you pay them, within certain limits as described in the Premiums Provision. Generally, you may pay premiums as long as the Insured is living. If the Insured is living at the policy anniversary nearest age 95, we will pay the net cash value to you.

Additional benefits, if any, are provided by rider.

This is only a brief description. The insurance is fully described in the various provisions of the policy.

### GUIDE TO POLICY PROVISIONS

| | Page |
|---|---|
| Accumulation Values | 6 |
| Application Copy | after 17 |
| Beneficiary's Rights | 4 |
| Breakdown of Monthly Deductions | 14,15 |
| Cash Value | 7 |
| Change of Beneficiary | 4 |
| Death Benefit | 4 |
| Definitions | 3 |
| Guaranteed Values | 6 |
| Grace Period | 6 |
| Misstatement of Age | 13 |
| Nonforfeiture Options | 8 |
| Ownership Provision | 3 |

| | Page |
|---|---|
| Option to Reduce the Face Amount | 9 |
| Payment of Cash Values and Loans | 13 |
| Payment of Death Benefit | 4 |
| Policy Data | 2,2A,2B |
| Policy Loans | 7 |
| Policy Statements and Illustrations | 13 |
| Premiums | 5 |
| Reinstatement of Lapsed Policy | 6 |
| Riders | after 17 |
| Surrender Option | 8 |
| Table of Guaranteed Monthly Deduction Rates | 2A |
| Table of Surrender Penalties | 11,12 |

P O L I C Y   D A T A

| | | | |
|---|---|---|---|
| LOAN INTEREST RATE | 7.40% IN ADVANCE | DEC 20 1990 | POLICY DATE |
| REINSTATEMENT INTEREST RATE | 6.00% | 50 | AGE OF INSURED |
| INSURED | GEORGE N ZACHARIA | 92332828 | POLICY NUMBER |
| FACE AMOUNT | $250,000 | DEC 20 1990 | DATE OF ISSUE |
| DEATH BENEFIT OPTION | OPTION I | RATED | CLASS OF RISK |
| OWNER | PRIME PUMP INC | NON-SMOKER | |

- - - - - - - - - - - - - - - - - - - - - - - - - -

THE CHARGE FOR ANY ADDITIONAL BENEFITS WHICH ARE PROVIDED BY RIDER IS SHOWN
BELOW.  ONLY A BRIEF DESCRIPTION IS GIVEN.  THE COMPLETE PROVISIONS ARE
INCLUDED IN THE RIDER.

| RIDER NUMBER | SCHEDULE OF ADDITIONAL BENEFITS | ANNUAL PREMIUM |
|---|---|---|
| ------------ | -------------------------------- | -------------- |
| | NONE | NO CHARGE |

- - - - - - - - - - - - - - - - - - - - - - - - - -

MINIMUM INITIAL PREMIUM:  $5,176.53
PLANNED PERIODIC PREMIUMS:  $7,090.00  ANNUAL
REQUIRED PREMIUM PER YEAR IN POLICY YEARS 1-5 : $5,176.53

- - - - - - - - - - - - - - - - - - - - - - - - - -

NOTE: THIS POLICY MAY TERMINATE PRIOR TO THE INSURED'S AGE 95  IF:
  (1) THE ACCUMULATION VALUE MINUS ANY LOAN IS LESS THAN THE MONTHLY
      DEDUCTION DUE, OR
  (2) THE REQUIRED PREMIUMS IN THE FIRST 5  YEARS ARE NOT PAID.

TABLE OF GUARANTEED MONTHLY DEDUCTION RATES PER $1,000 *

| POLICY YEAR BEGINNING | POLICY EXCLUDING RIDERS | POLICY YEAR BEGINNING | POLICY EXCLUDING RIDERS |
|---|---|---|---|
| DEC 20 1990 | $1.68 | DEC 20 2013 | $11.34 |
| DEC 20 1991 | 2.37 | DEC 20 2014 | 11.98 |
| DEC 20 1992 | 2.55 | DEC 20 2015 | 12.66 |
| DEC 20 1993 | 2.73 | DEC 20 2016 | 13.37 |
| DEC 20 1994 | 2.92 | DEC 20 2017 | 14.16 |
| DEC 20 1995 | 2.49 | DEC 20 2018 | 14.91 |
| DEC 20 1996 | 2.75 | DEC 20 2019 | 15.68 |
| DEC 20 1997 | 2.96 | DEC 20 2020 | 16.45 |
| DEC 20 1998 | 3.23 | DEC 20 2021 | 17.29 |
| DEC 20 1999 | 3.57 | DEC 20 2022 | 18.17 |
| DEC 20 2000 | 3.86 | DEC 20 2023 | 19.02 |
| DEC 20 2001 | 4.22 | DEC 20 2024 | 19.96 |
| DEC 20 2002 | 4.65 | DEC 20 2025 | 20.78 |
| DEC 20 2003 | 5.05 | DEC 20 2026 | 21.64 |
| DEC 20 2004 | 5.58 | DEC 20 2027 | 22.34 |
| DEC 20 2005 | 6.07 | DEC 20 2028 | 23.06 |
| DEC 20 2006 | 6.64 | DEC 20 2029 | 23.63 |
| DEC 20 2007 | 7.27 | DEC 20 2030 | 24.18 |
| DEC 20 2008 | 7.98 | DEC 20 2031 | 24.66 |
| DEC 20 2009 | 8.71 | DEC 20 2032 | 25.08 |
| DEC 20 2010 | 9.53 | DEC 20 2033 | 25.55 |
| DEC 20 2011 | 10.08 | DEC 20 2034 | 26.21 |
| DEC 20 2012 | 10.69 | | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

* TO FIND THE AMOUNT OF MONTHLY DEDUCTION DURING EACH POLICY YEAR, SEE THE
GUARANTEED VALUES SECTION. A POLICY FEE OF $4.00 WILL BE ADDED INTO
EACH MONTHLY DEDUCTION.

(4) THE DIFFERENCE BETWEEN THE ACCUMULATION VALUE AND THE CASH VALUE IS THE
    SURRENDER CHARGE.

TABLE OF POLICY VALUES AND BENEFITS

ILLUSTRATIVE PREMIUMS (1)
GUARANTEED BASIS (2)

| END OF POLICY YEAR | PLANNED ANNUALIZED PREMIUM | DEATH BENEFIT | ACCUMULATION VALUE(3) | CASH VALUE (4) |
|---|---|---|---|---|
| 1 | $7,090.00 | $250,000 | $2,129 | $0 |
| 2 | 7,090.00 | 250,000 | 2,316 | 0 |
| 3 | 7,090.00 | 250,000 | 1,970 | 0 |
| 4 | 7,090.00 | 250,000 | 1,045 | 0 |
| 5 | 7,090.00 | 0 | 0 | 0 |
| 6 | 0.00 | 0 | 0 | 0 |
| 7 | 0.00 | 0 | 0 | 0 |
| 8 | 0.00 | 0 | 0 | 0 |
| 9 | 0.00 | 0 | 0 | 0 |
| 10 | 0.00 | 0 | 0 | 0 |
| 11 | 0.00 | 0 | 0 | 0 |
| 12 | 0.00 | 0 | 0 | 0 |
| 13 | 0.00 | 0 | 0 | 0 |
| 14 | 0.00 | 0 | 0 | 0 |
| 15 | 0.00 | 0 | 0 | 0 |
| 16 | 0.00 | 0 | 0 | 0 |
| 17 | 0.00 | 0 | 0 | 0 |
| 18 | 0.00 | 0 | 0 | 0 |
| 19 | 0.00 | 0 | 0 | 0 |
| 20 | 0.00 | 0 | 0 | 0 |
| AGE 60 | 0.00 | 0 | 0 | 0 |
| AGE 65 | 0.00 | 0 | 0 | 0 |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

(1) THE ACCUMULATION AND CASH VALUES RESULT FROM THE INTEREST RATES,
    MONTHLY DEDUCTIONS, AND THE TIMELY PAYMENT OF THE PLANNED
    ANNUALIZED PREMIUMS.  PARTIAL SURRENDERS, SURRENDER-PENALTY-FREE
    WITHDRAWALS OR LOANS MAY CHANGE THESE RESULTS.

(2) RESULTS CALCULATED ON A GUARANTEED BASIS REFLECT GUARANTEED
    MONTHLY DEDUCTIONS AND THE CUMULATIVE GUARANTEED INTEREST RATE OF 5.5%.

(3) ACCUMULATION VALUES ILLUSTRATED ON A GUARANTEED BASIS REFLECT
    ACCUMULATED NET PREMIUMS PLUS ACCRUED INTEREST AT THE GUARANTEED
    MINIMUM ANNUAL INTEREST RATE LESS ACCRUED GUARANTEED MAXIMUM MONTHLY
    DEDUCTIONS WHICH INCLUDE THE POLICY FEE AND THE COST OF ANY RIDERS.
    WHILE A POLICY LOAN EXISTS, THE INTEREST RATE APPLICABLE TO THE
    ACCUMULATION VALUE SECURING THE LOAN MAY DIFFER FROM THE INTEREST
    RATE APPLICABLE TO THE ACCUMULATION VALUE NOT SECURING THE LOAN.

    THE REDUCED PAID-UP VALUES (MAXIMUM NET SINGLE PREMIUM AND FACE AMOUNT
    PER THOUSAND) ARE SHOWN IN THE POLICY AFTER THE NONFORFEITURE OPTIONS
    PROVISION.

92332828   ZACHARIA, GEORGE N\*\-1   DEC 02, 1991   YG350578-G

## DEFINITIONS

In this policy:

○

**We, our or us** means Transamerica Occidental Life Insurance Company.

**You and your** means the **Owner** of this policy.

**Accumulation Value** is the policy's total value as described in the Accumulation Values section.

**Age** means the Insured's age on the nearest birthday.

The **Beneficiary** is the person to whom we will pay the death benefit if the Insured dies.

**Cash Value** means the accumulation value as described in the Accumulation Values section, less any surrender penalty.

**Lapse** means termination of the policy due to insufficient premium or accumulation value.

A **Policy Loan** is indebtedness to us for a loan secured by this policy.

The **Maximum Loan Value** is the largest amount you may borrow under the loan provisions.

A **Monthly Deduction** is an amount we withdraw from the accumulation value at the end of each policy month.

The Monthly Deduction is equal to

    (a)  the monthly deduction rate, times .001, times the difference between the death benefit and the accumulation value at the beginning of the policy year,

plus  (b)  the monthly deduction for any riders,

plus  (c)  the policy fee as shown in the Policy Data.

The **Net Cash Value** is the cash value less any loans.

A **Net Premium** is 98% of any premium you pay.

**Reinstate** means to restore coverage after the policy has lapsed.

A **rider** is an attachment to the policy that provides an additional benefit.

We will send any **notice** under the provisions of this policy to your last known address and to any assignee of record.

We will use the **Policy Date** shown in the policy data to determine the monthly dates, policy anniversaries and policy years.

## OWNERSHIP

**Owner of the Policy** -- Only you, the Owner, are entitled to the rights granted under this policy while the Insured is living. If you are an individual and you die before the Insured, your rights will pass to the executor or administrator of your estate for disposition unless stated otherwise in this policy. If the Owner is a partnership, the rights belong to the partnership as it exists when a right is exercised.

**Assignment of the Policy** -- We are not responsible for the adequacy of any assignment. However, if you file the assignment with us and we record it at our Home Office, your rights and those of any revocable beneficiary will be subject to it.

## THE BENEFICIARY

**Who Receives the Death Benefit** -- When the Insured dies, we will pay the death benefit to the beneficiary. The beneficiary is as designated in the application, unless changed as shown under "How to Change a Beneficiary" below. If the beneficiary is a partnership, we will pay the death benefit to the partnership as it existed when the Insured died.

**Protection of the Death Benefit** -- To the extent permitted by law, no death benefit will be subject to the claims of the beneficiary's creditors or to any legal process against the beneficiary.

**If the Beneficiary Dies** -- If any beneficiary dies before the Insured, that beneficiary's interest in the death benefit will end. If any beneficiary dies at the same time as the Insured, or within 30 days after the Insured, that beneficiary's interest in the death benefit will end if no benefits have been paid to that beneficiary. If the interest of all designated beneficiaries has ended when the Insured dies, we will pay the death benefit to you. If you are not living at that time, we will pay the death benefit to the executor or administrator of your estate.

**How to Change a Beneficiary** -- You may change the designated beneficiary by sending a satisfactory written notice to us. The change will not be effective until we record it at our Home Office. Even if the Insured is not living when we record the change, the change will take effect as of the date it was signed. However, any benefits we pay before we record the change will not be subject to the change.

A beneficiary designated irrevocably may not be changed without the written consent of that beneficiary.

## PAYMENT OF THE DEATH BENEFIT

**Proof of Death** -- We will pay any benefit payable because of death when we receive due proof of the Insured's death. The proof must be sent to us at our Home Office. We will send appropriate forms to the beneficiary upon request. Any of our agents will help the beneficiary fill out the forms without charge. We will send all payments from our Home Office.

**Death Benefit** -- The amount of the death benefit may be affected by other policy provisions, such as Policy Loans or Misstatement of Age or Sex.

**Death Benefit Option** -- The death benefit will be based on whether you have chosen Option I or Option II, as shown in the Policy Data.

Option I: The death benefit will be the greater of:

(a) the face amount plus the net increase, if any, in the accumulation value from the last policy anniversary to the date of the Insured's death, or

(b) the death benefit factor times the accumulation value as of the date of the Insured's death.

Option II: The death benefit will be the greater of:

(a) the face amount plus the accumulation value as of the date of the Insured's death; or

(b) the death benefit factor times the accumulation value as of the date of the Insured's death.

In no event will the amount of death benefit be less than the amount needed to continue to qualify the policy as a life insurance contract under Section 7702 of the Internal Revenue Code, as in effect at the time this policy is issued and the regulations thereunder.

We will reduce the death benefit by any policy loans and by the portion of the grace period premium necessary to provide insurance to the date of the Insured's death.

The net increase in accumulation value is the sum of all net premiums less any refunds, minus the sum of all accrued monthly deductions from the last policy anniversary to the date of death, plus accrued interest from the last policy anniversary to the date of death, minus the pro rata portion of the monthly deduction for the period from the last monthly date to the date of death. (See Accumulation Values in the Guaranteed Values section for details.) Partial Surrender amounts, Partial Surrender penalties, and Surrender—Penalty-Free Withdrawal amounts are not included as part of the net increase in accumulation value for the purpose of calculating the death benefit as of the date of death.

92332828                ZACHARIA,GEORGE N**                DEC 02, 1991      10350576-G

## DEATH BENEFIT FACTORS

| Insured's Attained Age | Death Benefit Factor | Insured's Attained Age | Death Benefit Factor |
|---|---|---|---|
| 40 and below | 2.50 | 70 | 1.15 |
| 41 | 2.43 | 71 | 1.13 |
| 42 | 2.36 | 72 | 1.11 |
| 43 | 2.29 | 73 | 1.09 |
| 44 | 2.22 | 74 | 1.07 |
| 45 | 2.15 | 75 | 1.05 |
| 46 | 2.09 | 76 | 1.05 |
| 47 | 2.03 | 77 | 1.05 |
| 48 | 1.97 | 78 | 1.05 |
| 49 | 1.91 | 79 | 1.05 |
| 50 | 1.85 | 80 | 1.05 |
| 51 | 1.78 | 81 | 1.05 |
| 52 | 1.71 | 82 | 1.05 |
| 53 | 1.64 | 83 | 1.05 |
| 54 | 1.57 | 84 | 1.05 |
| 55 | 1.50 | 85 | 1.05 |
| 56 | 1.46 | 86 | 1.05 |
| 57 | 1.42 | 87 | 1.05 |
| 58 | 1.38 | 88 | 1.05 |
| 59 | 1.34 | 89 | 1.05 |
| 60 | 1.30 | 90 | 1.05 |
| 61 | 1.28 | 91 | 1.04 |
| 62 | 1.26 | 92 | 1.03 |
| 63 | 1.24 | 93 | 1.02 |
| 64 | 1.22 | 94 | 1.01 |
| 65 | 1.20 | | |
| 66 | 1.19 | | |
| 67 | 1.18 | | |
| 68 | 1.17 | | |
| 69 | 1.16 | | |

## PREMIUMS

We will accept any amount you send us as a premium payment while this policy is in force, subject to the Premium Limitation provision and these conditions:

1. The minimum initial premium is shown in the Policy Data. It is payable on the Policy Date. You may send subsequent premiums to our Home Office or you may pay them to an agent or cashier we authorize. We will give you a receipt if you ask for one.

2. You must pay the minimum required premium for the first 5 policy years. At the end of each of the first 5 policy years we will calculate the cumulative total of all premiums paid, less any Partial Surrenders and Surrender-Penalty-Free Withdrawals. We will divide this total by the number of years since the policy date. This amount must equal or exceed the required premium per year for each year in the required premium period or your policy will lapse. (See page 2 of the policy data.)

3. You may pay premiums at any time, but only if the amount of each premium is at least $25.

**Premium Limitation** -- We reserve the right to refund any unscheduled premium during a particular policy year if the total premium paid:

(a) increases the difference between the death benefit and the accumulation value, and

(b) is more than $20 per thousand of face amount and more than three times the total of the monthly deductions for the last year.

We also reserve the right to refund any unscheduled premiums that exceed $25,000 in any 12-month period.

After the first policy year and before the sixth policy year, we reserve the right to refund any unscheduled premium that would cause the total premium deposited in any one of those policy years to exceed five times the Required Premium Per Year. Beginning with the sixth policy year, we reserve the right to refund any unscheduled premium that would cause the total premium deposited in any one policy year to exceed three times the Required Premium Per Year. The Required Premium Per Year is shown on page 2 of the policy data. We will not refund any premium if that premium would cause the accumulation value minus any loan to be less than the monthly deduction due.

We will not refund any amount if doing so would cause your policy to lapse before the next anniversary.

As of the end of any policy year, if the premiums paid exceed the amount allowable if the death benefit is to qualify for the federal income tax exclusion, we will remove the excess amount of premiums paid from the policy, with interest, as of the end of that policy year. We will refund to you this excess amount (including interest) within 60 days after the end of that policy year.

Such an excess amount could occur, for example, as a result of a Partial Surrender or other change in the benefits or terms of the policy, since the premium amount allowable for the policy may be reduced.

The amount refundable will not exceed the net cash value of the policy. If the entire net cash value is refunded, we will treat the transaction as a full surrender of your policy.

**Continuation of Insurance** -- Between premium payments we automatically continue your policy at the same face amount and with any additional benefits provided by rider, subject to the Grace Period provision below. Refer to the Monthly Deduction section for further explanation.

5

**Grace Period --** A grace period is a period of 31 days after (a) a monthly date when the accumulation value minus any loan is less than the monthly deduction due, or (b) a policy anniversary on which the minimum required premium has not been paid during the first 5 policy years. We will notify you that the grace period has begun and that you must pay a premium large enough to keep the policy in force before the 31 days are up. If you do not pay enough premium, your policy will lapse, subject to the Nonforfeiture Options provision.

Since a monthly deduction is made on each monthly date for the prior month, and a nominal 31-day grace period is provided after that monthly date, there will always be at least a 62-day effective grace period for payment of overdue premiums.

During the grace period, we will not charge interest on the premium due. If the Insured dies during the grace period and before you pay the premium we will subtract from the death benefit the cost of coverage to the date the Insured died.

**Reinstatement of Lapsed Policy --** If this policy lapses, it may be reinstated provided it was not surrendered. To reinstate the policy, you must meet the following conditions:

1.  You must request reinstatement in writing within three years after the date of lapse and before the Insured's age 95.

2.  The Insured must still be insurable by our standards.

3.  If any loans existed when the policy lapsed, you must repay or reinstate them with interest compounded annually from the date of lapse at the reinstatement interest rate of 6%.

4.  The reinstated policy will be subject to the minimum premium requirement during the first 5 policy years. (See page 2 of Policy Data and Premiums provision, number 2.) If the policy lapsed during one of the first 5 policy years and is reinstated in a different policy year, you must pay a premium large enough to meet the minimum premium requirement at the time of reinstatement, with interest compounded annually at the reinstatement interest rate of 6%. If the policy lapsed after the fifth policy year, or if it lapsed in one of the first 5 policy years and is reinstated in the same policy year, you must pay a premium large enough to cover two monthly deductions due when the policy lapsed and three monthly deductions due when the policy is reinstated.

The Accumulation Value of the reinstated policy will be: the surrender penalty at the time of lapse; plus any net cash value we paid you at the time of lapse; plus any loan reinstated; plus 98% of any premium you pay at reinstatement; minus any monthly deductions due at the time of lapse.

## GUARANTEED VALUES

**Accumulation Values --** The accumulation value on any specified date on or before the first policy anniversary is equal to:

1.  All net premiums paid less any refunds since issue, plus accrued interest from the date each premium is received in the Home Office to the specified date.

minus  2.  All monthly deductions charged since issue, plus accrued interest from each monthly date to the specified date.

minus  3.  Any partial surrenders or Surrender-Penalty-Free Withdrawals since issue, plus accrued interest from each partial surrender date to the specified date.

minus  4.  A prorata portion of the monthly deduction applicable to the period of time from the last monthly date on or before the specified date to the specified date.

The accumulation value on any specified date after the first policy anniversary is equal to:

1.  The accumulation value on the last policy anniversary plus accrued interest from the last policy anniversary to the specified date.

plus  2.  All net premiums paid less any refunds since the last policy anniversary, plus accrued interest from the date each premium is received in the Home Office to the specified date.

minus  3.  All monthly deductions charged since the last policy anniversary, plus accrued interest from each monthly date to the specified date.

minus  4.  Any partial surrenders and Surrender-Penalty-Free Withdrawals including partial surrender penalties since the last policy anniversary, plus accrued interest from each partial surrender date to the specified date.

minus  5.  A prorata portion of the monthly deduction applicable to the period of time from the last monthly date on or before the specified date to the specified date.

1-175  06-188

A Table of Policy Values is included in this policy. It is based on the information you gave us when the policy was issued. The values shown may change as the declared interest rates, your premium payments, and other factors change from the illustrated data. Every year we will send you a statement of actual policy values.

**Guaranteed Interest Rates** -- The net premium accrues simple interest from the date we receive it in the Home Office. Interest is credited annually on each policy anniversary.

We guarantee that your accumulation value on any policy anniversary will be at least equal to what it would have been if the credited interest rate had always been 5.5%. The minimum interest rate we credit at any one time will never be less than 4%.

We may declare a higher interest rate than the guaranteed minimum rate at any time. Each rate we declare replaces the guaranteed minimum rate until we declare a different one.

The interest rate for any portion of the accumulation value equal to the amount of any policy loan will be at the effective annual loan interest rate less 2.5%.

**Monthly Deduction Rates** -- We will determine the monthly deduction rate for each policy year at the beginning of that year. We will use the Insured's age as of that policy year. The guaranteed monthly deduction for nonsmokers is the cost of insurance. The guaranteed monthly deduction for smokers is made up of a cost of insurance portion and an expense portion. The breakdown of the guaranteed monthly deduction for smokers issued at the standard class of risk appears on pages 14 and 15.

A Table of Guaranteed Monthly Deduction Rates is in the policy data. We may use rates lower than these guaranteed monthly deduction rates. We will never use higher rates.

**Monthly Deduction** -- At the end of each policy month, we will take the monthly deduction for the prior month from the accumulation value.

The Monthly Deduction is equal to

    (a)  the monthly deduction rate, times .001, times the difference between the death benefit and the accumulation value at the beginning of the policy year,

plus  (b)  the monthly deduction for any riders,

plus  (c)  the policy fee as shown in the Policy Data.

## CASH VALUE

You may borrow the cash value, or take it as a partial or full surrender of the policy. All of these transactions are described in this section. We guarantee that the cash value always equals or exceeds the amount required by the law in effect at the time of issue in the state in which this policy is delivered.

**Policy Loans** -- We will make a loan subject to the following conditions:

1.  The maximum loan amount is the accumulation value as of the date of the loan request, minus

    a.  any existing loan(s);

    b.  interest on the amount of the loan to the end of the policy year; and

    c.  the full surrender penalty or three monthly deductions, whichever is greater.

2.  You must pay interest on the loan at the loan interest rate annually in advance. If you do not pay the interest when it is due, we will add the amount of interest to the loan. We will charge interest on this amount at the same interest rate being charged on the loan.

3.  You must assign the policy to us to the extent of the outstanding loan. If the Insured dies, we will deduct the outstanding loan from the death benefit before we pay the death benefit to the beneficiary.

4.  The loan will be secured by that portion of the accumulation value equal to the amount of the loan.

**Loan Repayment** -- You may repay any part of a loan at any time while the Insured is living and before the Insured's age 95.

If you wish to make a loan repayment, you must tell us that the payment you send us is for that purpose. Unless your payment is clearly marked as a loan repayment, we will assume it is a premium payment except as indicated in the Premium Limitation Provision. When we receive a loan repayment we will apply it to the portion of the accumulation value that secures a loan.

Your policy will not lapse if you do not repay a loan. However, the portion of the accumulation value not securing a loan must be large enough to cover the monthly deduction due and any loan interest due not paid in cash. (See Grace Period provision for details.)

**Partial Surrender** -- You may surrender a portion of this policy for its value if you send us a written request. We will deduct the partial surrender penalty and the surrender amount you request from the policy's accumulation value. If you chose death benefit Option I, we will also deduct the partial surrender penalty and the amount you request from the policy's face amount. The face amount may not be less than $25,000.

The partial surrender penalty is the greater of:

1) $25, or

2) the proportionate full surrender penalty.

The proportionate full surrender penalty may be calculated as follows:

Let X = surrender amount you request
a = full surrender penalty per 1,000 of face amount
(see Table of Surrender Penalties)

The proportionate full surrender penalty =

$$X \text{ times } \frac{a}{1000 - a}$$

In any policy year, the maximum amount that you may request and receive by Partial Surrender is:

1) the accumulation value,

minus   2) any indebtedness,

minus   3) the sum of 3 monthly deductions,

minus   4) the greater of $25 or the full surrender penalty.

If you ask for an amount larger than the maximum described above, we will treat it as a request for a full surrender of the policy.

**Surrender-Penalty-Free Withdrawal** -- At any time after the first policy year you may make a withdrawal without incurring a partial surrender penalty, within the limits outlined below.

When you request a partial surrender in the second or later policy year we will calculate the amount eligible for surrender without penalty. This amount will be the lesser of:

(a) 10% of the policy's accumulation value, minus the sum of all Surrender-Penalty-free withdrawals since the last policy anniversary or

(b) the maximum amount available as a partial surrender described above.

During the first five policy years the sum of all Surrender-Penalty-Free Withdrawals and Partial Surrenders may not exceed the sum of all premiums paid less the sum of all required premiums since the policy date. (See Premium Provision Number 2 on page 5.)

We will process a Surrender-Penalty-Free Withdrawal for the eligible amount. The remainder of any amount you requested we will process as a partial surrender.

We will deduct the withdrawal amount you request from the policy's accumulation value.

**Nonforfeiture Options** -- You may continue or surrender the policy under one of the following options:

Option 1. Paid-Up Life -- You may exchange this policy for a single premium paid up whole life policy. These conditions will apply:

(a) The policy must be in force when you request the change.

(b) You will surrender all rights under this policy in exchange for the paid-up policy.

(c) We will calculate the face amount of the paid-up policy in this way: the net cash value divided by the net single premium at the Insured's attained age equals the paid-up face amount.

Evidence of Insurability -- When you request this option, we will calculate the difference between the amount of paid-up insurance and the total net single premium. We will compare that amount to the difference between the death benefit and the accumulation value under this policy on the date you choose this option. If the difference between the amount of paid-up insurance and the total net single premium is greater than the difference between the death benefit and the accumulation value, the Insured must give us satisfactory evidence of insurability. We calculate the total net single premium by taking the face amount of the paid-up policy and multiplying it by the net single premium per thousand.

If the Insured does not send us satisfactory evidence of insurability, we will reduce the amount of paid-up insurance accordingly. If there is any net cash value left over after you purchase the paid-up insurance, we will refund it to you.

(d) We will issue and date the paid-up policy as of the date you surrender this policy.

(e) The premiums we use for the single premium paid-up insurance will be those in effect as of the date you request the change. They will never be greater than the rates shown in the Table of Maximum Net Single Premiums for Paid-Up Insurance on the following page.

(f) There is a Table of Paid-Up Insurance per Thousand of Net Cash Value following the Table of Net Single Premiums.

(g) The paid-up insurance will have cash values. If you surrender any paid-up insurance within 30 days of a policy anniversary, the cash value of the insurance will not be less than the cash value on that anniversary.

**Option 2. Extended Term Insurance** -- If the class of risk shown on page 2 of the Policy Data is "Standard," you may continue this policy as non-participating extended term insurance. These conditions will apply:

(a) The policy must be in force when you request the change.

(b) You will surrender all rights under this policy in exchange for the extended term policy.

(c) We will calculate the face amount of the extended term policy in this way: this policy's face less any indebtedness as of the date of your request equals the extended term face amount.

(d) We will calculate the length of the coverage period of the extended term policy by applying the net cash value of this policy as a net single premium for the extended term coverage.

(e) We will issue and date the extended term policy as of the date you surrender this policy.

**Option 3. Full Surrender** -- You may surrender the policy for its net cash value. The net cash value on the date of your request is the accumulation value minus the surrender penalty and any existing loans.

There is a Table of Surrender Penalties following the Table of Paid-Up Insurance per Thousand of Net Cash Value. We will use the factors in the table to determine the surrender penalty we will apply. To calculate the full surrender penalty, find the factor for the Insured's issue age and the number of years the policy has been in force. Multiply this factor by the number of thousands of face amount of the policy. This is the full surrender penalty. There is no surrender penalty after 20 policy years.

If you do not choose an option and your policy lapses at the end of a grace period, or because you did not pay the Required Preium Per Year as described in the Premiums provision, we will automatically use any remaining net cash value to purchase Paid-Up Insurance as described in Option 1.

**Option to Reduce the Face Amount** -- The Owner may request a decrease of the face amount of this policy if all the conditions are met.

The following conditions will apply:

1. You must make a written request to us.

2. At the request date, this policy must be in force and the Insured must be living.

3. The amount of the reduction in face amount must be at least $25,000.

4. The new face amount may not be less than $100,000.

5. The decrease of the face amount of this policy may cause a change in the monthly deduction rates to be charged.

6. A surrender Penalty will result from the decrease in the face amount if the change is made during the 20 year surrender penalty period.

## TABLE OF MAXIMUM NET SINGLE PREMIUMS FOR PAID-UP INSURANCE PER $1000

| Insured's Attained Age | Male | Female | Insured's Attained Age | Male | Female | Insured's Attained Age | Male | Female | Insured's Attained Age | Male | Female |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 44.43 | 34.75 | 25 | 105.10 | 85.37 | 50 | 296.12 | 241.84 | 75 | 651.28 | 590.50 |
| 1 | 42.87 | 33.87 | 26 | 109.31 | 89.01 | 51 | 307.76 | 251.43 | 76 | 665.63 | 607.99 |
| 2 | 44.20 | 34.89 | 27 | 113.79 | 92.82 | 52 | 319.72 | 261.33 | 77 | 679.65 | 625.33 |
| 3 | 45.69 | 36.03 | 28 | 118.54 | 96.83 | 53 | 331.99 | 271.55 | 78 | 693.39 | 642.55 |
| 4 | 47.27 | 37.25 | 29 | 123.57 | 101.02 | 54 | 344.54 | 282.07 | 79 | 706.94 | 659.70 |
| 5 | 48.97 | 38.56 | 30 | 128.88 | 105.41 | 55 | 357.35 | 292.92 | 80 | 720.36 | 676.81 |
| 6 | 50.81 | 39.95 | 31 | 134.47 | 110.01 | 56 | 370.41 | 304.09 | 81 | 733.65 | 693.83 |
| 7 | 52.79 | 41.45 | 32 | 140.33 | 114.82 | 57 | 383.72 | 315.64 | 82 | 746.79 | 710.69 |
| 8 | 54.93 | 43.04 | 33 | 146.49 | 119.86 | 58 | 397.29 | 327.60 | 83 | 759.68 | 727.31 |
| 9 | 57.24 | 44.74 | 34 | 152.93 | 125.14 | 59 | 411.14 | 340.03 | 84 | 772.26 | 743.59 |
| 10 | 59.69 | 46.54 | 35 | 159.66 | 130.65 | 60 | 425.27 | 352.94 | 85 | 784.51 | 759.53 |
| 11 | 62.29 | 48.45 | 36 | 166.68 | 136.41 | 61 | 439.65 | 366.35 | 86 | 796.54 | 775.20 |
| 12 | 65.00 | 50.46 | 37 | 174.00 | 142.40 | 62 | 454.26 | 380.23 | 87 | 808.55 | 790.79 |
| 13 | 67.78 | 52.55 | 38 | 181.61 | 148.63 | 63 | 469.05 | 394.50 | 88 | 820.86 | 806.56 |
| 14 | 70.59 | 54.74 | 39 | 189.51 | 155.08 | 64 | 483.98 | 409.10 | 89 | 833.91 | 822.91 |
| 15 | 73.40 | 56.99 | 40 | 197.69 | 161.75 | 65 | 499.01 | 423.97 | 90 | 848.33 | 840.41 |
| 16 | 76.21 | 59.33 | 41 | 206.17 | 168.63 | 66 | 514.10 | 439.10 | 91 | 865.07 | 859.92 |
| 17 | 79.01 | 61.75 | 42 | 214.92 | 175.73 | 67 | 529.27 | 454.52 | 92 | 885.52 | 882.72 |
| 18 | 81.83 | 64.25 | 43 | 223.98 | 183.05 | 68 | 544.52 | 470.29 | 93 | 911.89 | 910.88 |
| 19 | 84.70 | 66.87 | 44 | 233.33 | 190.62 | 69 | 559.86 | 486.48 | 94 | 947.86 | 947.86 |
| 20 | 87.66 | 69.60 | 45 | 243.00 | 198.44 | 70 | 575.29 | 503.12 | | | |
| 21 | 90.75 | 72.46 | 46 | 252.96 | 206.63 | 71 | 590.76 | 520.19 | | | |
| 22 | 94.01 | 75.45 | 47 | 263.25 | 214.91 | 72 | 606.20 | 537.59 | | | |
| 23 | 97.48 | 78.60 | 48 | 273.87 | 223.58 | 73 | 621.51 | 555.21 | | | |
| 24 | 101.17 | 81.91 | 49 | 284.82 | 232.56 | 74 | 636.56 | 572.89 | | | |

## TABLE OF PAID-UP INSURANCE PER $1,000 OF NET CASH VALUE

$$\text{Amount of Paid-Up Insurance} = \left( \frac{\text{Cash Value}}{1000} \right) \times \text{Factor for the Insured's Attained Age.}$$

| Insured's Attained Age | Male | Female | Insured's Attained Age | Male | Female | Insured's Attained Age | Male | Female | Insured's Attained Age | Male | Female |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 22,507.22 | 28,775.64 | 25 | 9,513.86 | 11,713.38 | 50 | 3,376.98 | 4,134.92 | 75 | 1,535.44 | 1,693.47 |
| 1 | 23,324.67 | 29,523.91 | 26 | 9,147.93 | 11,234.54 | 51 | 3,249.24 | 3,977.23 | 76 | 1,502.32 | 1,644.76 |
| 2 | 22,620.15 | 28,658.14 | 27 | 8,787.85 | 10,772.70 | 52 | 3,127.69 | 3,826.47 | 77 | 1,471.34 | 1,599.15 |
| 3 | 21,884.20 | 27,752.75 | 28 | 8,435.63 | 10,327.28 | 53 | 3,012.11 | 3,682.44 | 78 | 1,442.19 | 1,558.29 |
| 4 | 21,162.99 | 26,842.99 | 29 | 8,092.26 | 9,898.65 | 54 | 2,902.39 | 3,545.10 | 79 | 1,414.55 | 1,515.83 |
| 5 | 20,420.14 | 25,932.05 | 30 | 7,759.04 | 9,486.11 | 55 | 2,798.38 | 3,413.90 | 80 | 1,388.20 | 1,477.52 |
| 6 | 19,681.01 | 25,029.02 | 31 | 7,436.44 | 9,089.78 | 56 | 2,699.70 | 3,288.43 | 81 | 1,363.04 | 1,441.28 |
| 7 | 18,942.84 | 24,124.68 | 32 | 7,125.61 | 8,708.89 | 57 | 2,606.05 | 3,168.15 | 82 | 1,339.07 | 1,407.07 |
| 8 | 18,202.40 | 23,293.05 | 33 | 6,826.15 | 8,342.76 | 58 | 2,517.00 | 3,052.48 | 83 | 1,316.33 | 1,374.92 |
| 9 | 17,469.42 | 22,350.98 | 34 | 6,538.73 | 7,990.75 | 59 | 2,432.21 | 2,940.91 | 84 | 1,294.90 | 1,344.82 |
| 10 | 16,751.70 | 21,485.22 | 35 | 6,263.09 | 7,653.80 | 60 | 2,351.43 | 2,833.28 | 85 | 1,274.68 | 1,316.61 |
| 11 | 16,052.87 | 20,637.07 | 36 | 5,999.20 | 7,330.57 | 61 | 2,274.53 | 2,729.56 | 86 | 1,255.43 | 1,289.98 |
| 12 | 15,384.53 | 19,815.16 | 37 | 5,746.91 | 7,022.05 | 62 | 2,201.38 | 2,629.98 | 87 | 1,236.78 | 1,264.55 |
| 13 | 14,752.96 | 19,025.16 | 38 | 5,506.22 | 6,728.03 | 63 | 2,131.94 | 2,534.81 | 88 | 1,218.23 | 1,239.83 |
| 14 | 14,166.12 | 18,267.59 | 39 | 5,276.75 | 6,448.16 | 64 | 2,066.17 | 2,444.38 | 89 | 1,199.17 | 1,215.20 |
| 15 | 13,622.52 | 17,544.43 | 40 | 5,058.29 | 6,182.31 | 65 | 2,003.95 | 2,586.58 | 90 | 1,178.78 | 1,189.89 |
| 16 | 13,120.49 | 16,853.89 | 41 | 4,850.34 | 5,929.93 | 66 | 1,945.12 | 2,277.36 | 91 | 1,155.98 | 1,162.90 |
| 17 | 12,655.36 | 16,193.70 | 42 | 4,652.73 | 5,690.38 | 67 | 1,889.38 | 2,200.00 | 92 | 1,129.28 | 1,132.86 |
| 18 | 12,220.37 | 15,561.82 | 43 | 4,464.57 | 5,462.81 | 68 | 1,836.48 | 2,126.32 | 93 | 1,096.62 | 1,097.84 |
| 19 | 11,806.10 | 14,952.23 | 44 | 4,285.63 | 5,245.96 | 69 | 1,786.16 | 2,055.55 | 94 | 1,055.00 | 1,055.00 |
| 20 | 11,407.23 | 14,365.95 | 45 | 4,115.23 | 5,039.15 | 70 | 1,738.25 | 1,987.57 | | | |
| 21 | 11,018.36 | 13,800.03 | 46 | 3,953.10 | 4,841.77 | 71 | 1,692.73 | 1,922.37 | | | |
| 22 | 10,636.17 | 13,252.08 | 47 | 3,798.61 | 4,653.07 | 72 | 1,649.61 | 1,860.13 | | | |
| 23 | 10,258.08 | 12,721.70 | 48 | 3,651.36 | 4,472.52 | 73 | 1,608.99 | 1,801.11 | | | |
| 24 | 9,883.97 | 12,208.51 | 49 | 3,510.89 | 4,299.93 | 74 | 1,570.94 | 1,745.54 | | | |

1-175 06-188

### Table of Surrender Penalties
### Per $1,000 Face Amount

Policy Year

| Issue Age | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21+ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 8 | 8 | 7 | 6 | 5 | 4 | 4 | 3 | 2 | 1 | 1 | 0 |
| 1 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 8 | 8 | 8 | 7 | 6 | 5 | 4 | 4 | 3 | 2 | 1 | 1 | 0 |
| 2 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 8 | 8 | 8 | 7 | 6 | 5 | 4 | 4 | 3 | 2 | 1 | 1 | 0 |
| 3 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 8 | 8 | 8 | 7 | 6 | 5 | 4 | 4 | 3 | 2 | 1 | 1 | 0 |
| 4 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 8 | 8 | 8 | 7 | 6 | 5 | 4 | 4 | 3 | 2 | 1 | 1 | 0 |
| 5 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 8 | 8 | 8 | 7 | 6 | 5 | 4 | 4 | 3 | 2 | 1 | 1 | 0 |
| 6 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 8 | 8 | 8 | 7 | 6 | 5 | 4 | 4 | 3 | 2 | 1 | 1 | 0 |
| 7 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 8 | 8 | 8 | 7 | 6 | 5 | 4 | 4 | 3 | 2 | 1 | 1 | 0 |
| 8 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 8 | 8 | 8 | 7 | 6 | 5 | 4 | 4 | 3 | 2 | 1 | 1 | 0 |
| 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 8 | 8 | 8 | 7 | 6 | 5 | 4 | 4 | 3 | 2 | 1 | 1 | 0 |
| 10 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 8 | 8 | 8 | 7 | 6 | 5 | 4 | 4 | 3 | 2 | 1 | 1 | 0 |
| 11 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 8 | 8 | 8 | 7 | 6 | 5 | 4 | 4 | 3 | 2 | 1 | 1 | 0 |
| 12 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 8 | 8 | 8 | 7 | 6 | 5 | 4 | 4 | 3 | 2 | 1 | 1 | 0 |
| 13 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 8 | 8 | 8 | 7 | 6 | 5 | 4 | 3 | 3 | 2 | 1 | 1 | 0 |
| 14 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 8 | 8 | 8 | 8 | 7 | 6 | 5 | 4 | 3 | 3 | 2 | 1 | 1 | 0 |
| 15 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 8 | 8 | 8 | 8 | 7 | 6 | 5 | 4 | 3 | 3 | 2 | 1 | 1 | 0 |
| 16 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 8 | 8 | 8 | 8 | 7 | 6 | 5 | 4 | 3 | 3 | 2 | 1 | 1 | 0 |
| 17 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 8 | 8 | 8 | 8 | 7 | 6 | 5 | 4 | 3 | 3 | 2 | 1 | 1 | 0 |
| 18 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 8 | 8 | 8 | 8 | 7 | 6 | 5 | 4 | 3 | 3 | 2 | 1 | 1 | 0 |
| 19 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 8 | 8 | 8 | 8 | 7 | 6 | 5 | 4 | 3 | 3 | 2 | 1 | 1 | 0 |
| 20 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 8 | 8 | 8 | 8 | 7 | 6 | 5 | 4 | 3 | 3 | 2 | 1 | 1 | 0 |
| 21 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 9 | 9 | 8 | 7 | 6 | 5 | 4 | 3 | 2 | 1 | 1 | 0 |
| 22 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 9 | 9 | 8 | 7 | 6 | 5 | 4 | 3 | 2 | 1 | 1 | 0 |
| 23 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 9 | 9 | 9 | 8 | 7 | 6 | 5 | 4 | 3 | 2 | 1 | 1 | 0 |
| 24 | 12 | 12 | 12 | 12 | 12 | 12 | 11 | 11 | 11 | 11 | 10 | 9 | 8 | 7 | 5 | 4 | 3 | 2 | 2 | 1 | 0 |
| 25 | 12 | 12 | 12 | 12 | 12 | 12 | 11 | 11 | 11 | 10 | 10 | 9 | 8 | 6 | 5 | 4 | 3 | 2 | 2 | 1 | 0 |
| 26 | 12 | 12 | 12 | 12 | 12 | 12 | 11 | 11 | 11 | 10 | 10 | 9 | 8 | 6 | 5 | 4 | 3 | 2 | 1 | 1 | 0 |
| 27 | 14 | 13 | 13 | 13 | 13 | 13 | 13 | 12 | 12 | 12 | 11 | 10 | 9 | 7 | 6 | 5 | 4 | 3 | 2 | 1 | 0 |
| 28 | 14 | 13 | 13 | 13 | 13 | 13 | 13 | 12 | 12 | 12 | 11 | 10 | 8 | 7 | 6 | 5 | 4 | 3 | 2 | 1 | 0 |
| 29 | 14 | 13 | 13 | 13 | 13 | 13 | 13 | 12 | 12 | 12 | 11 | 10 | 8 | 7 | 6 | 5 | 4 | 3 | 2 | 1 | 0 |
| 30 | 15 | 15 | 15 | 15 | 14 | 14 | 14 | 14 | 13 | 13 | 12 | 11 | 9 | 8 | 6 | 5 | 4 | 3 | 2 | 1 | 0 |
| 31 | 15 | 15 | 15 | 15 | 14 | 14 | 14 | 14 | 13 | 13 | 12 | 11 | 9 | 8 | 6 | 5 | 4 | 3 | 2 | 1 | 0 |
| 32 | 16 | 16 | 16 | 16 | 16 | 16 | 15 | 15 | 14 | 14 | 13 | 12 | 10 | 8 | 7 | 6 | 4 | 3 | 2 | 1 | 0 |
| 33 | 17 | 16 | 16 | 16 | 16 | 16 | 15 | 15 | 14 | 14 | 13 | 12 | 10 | 8 | 7 | 5 | 4 | 3 | 2 | 1 | 0 |
| 34 | 18 | 18 | 18 | 17 | 17 | 17 | 17 | 16 | 16 | 15 | 15 | 13 | 11 | 9 | 7 | 6 | 4 | 3 | 2 | 1 | 0 |
| 35 | 18 | 18 | 18 | 17 | 17 | 17 | 16 | 16 | 15 | 15 | 14 | 13 | 11 | 9 | 7 | 6 | 4 | 3 | 2 | 1 | 0 |
| 36 | 19 | 19 | 19 | 19 | 19 | 18 | 18 | 17 | 17 | 16 | 16 | 13 | 11 | 10 | 8 | 6 | 5 | 3 | 2 | 1 | 0 |
| 37 | 20 | 19 | 19 | 19 | 18 | 18 | 18 | 17 | 17 | 16 | 15 | 13 | 11 | 10 | 8 | 6 | 5 | 3 | 2 | 1 | 0 |
| 38 | 21 | 21 | 20 | 20 | 20 | 20 | 19 | 18 | 18 | 17 | 16 | 14 | 12 | 10 | 8 | 7 | 5 | 3 | 2 | 1 | 0 |
| 39 | 21 | 21 | 20 | 20 | 20 | 19 | 19 | 18 | 18 | 17 | 16 | 14 | 12 | 10 | 8 | 6 | 5 | 3 | 2 | 1 | 0 |

## Table of Surrender Penalties
## Per $1,000 Face Amount

Policy Year

| Issue Age | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21+ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 40 | 22 | 22 | 22 | 21 | 21 | 21 | 20 | 19 | 19 | 18 | 17 | 15 | 13 | 11 | 9 | 7 | 5 | 4 | 2 | 1 | 0 |
| 41 | 23 | 22 | 22 | 22 | 22 | 22 | 21 | 21 | 20 | 19 | 18 | 16 | 13 | 11 | 9 | 7 | 5 | 4 | 2 | 1 | 0 |
| 42 | 23 | 23 | 23 | 23 | 22 | 22 | 21 | 21 | 20 | 19 | 18 | 16 | 13 | 11 | 9 | 7 | 5 | 4 | 2 | 1 | 0 |
| 43 | 24 | 24 | 24 | 23 | 23 | 23 | 23 | 22 | 21 | 20 | 19 | 17 | 14 | 12 | 9 | 7 | 5 | 4 | 2 | 1 | 0 |
| 44 | 25 | 25 | 24 | 24 | 24 | 24 | 23 | 23 | 22 | 21 | 20 | 17 | 15 | 12 | 10 | 8 | 6 | 4 | 2 | 1 | 0 |
| 45 | 26 | 25 | 25 | 25 | 24 | 24 | 24 | 24 | 23 | 23 | 22 | 19 | 16 | 13 | 11 | 8 | 6 | 4 | 3 | 1 | 0 |
| 46 | 26 | 26 | 26 | 26 | 25 | 25 | 25 | 24 | 24 | 24 | 23 | 20 | 17 | 14 | 11 | 9 | 6 | 4 | 3 | 1 | 0 |
| 47 | 27 | 27 | 27 | 26 | 26 | 26 | 25 | 25 | 25 | 24 | 24 | 20 | 17 | 14 | 11 | 9 | 6 | 4 | 3 | 1 | 0 |
| 48 | 28 | 28 | 28 | 27 | 27 | 26 | 26 | 26 | 25 | 25 | 24 | 21 | 18 | 15 | 12 | 9 | 7 | 5 | 3 | 1 | 0 |
| 49 | 29 | 29 | 28 | 28 | 28 | 27 | 27 | 26 | 26 | 26 | 25 | 22 | 18 | 15 | 12 | 9 | 7 | 5 | 3 | 1 | 0 |
| 50 | 30 | 30 | 29 | 29 | 29 | 28 | 28 | 27 | 27 | 26 | 26 | 25 | 24 | 21 | 18 | 15 | 12 | 9 | 6 | 3 | 0 |
| 51 | 31 | 31 | 30 | 30 | 30 | 29 | 29 | 28 | 28 | 27 | 26 | 26 | 24 | 21 | 18 | 15 | 12 | 9 | 6 | 3 | 0 |
| 52 | 32 | 32 | 32 | 31 | 31 | 30 | 30 | 29 | 28 | 28 | 27 | 27 | 24 | 21 | 18 | 15 | 12 | 9 | 6 | 3 | 0 |
| 53 | 34 | 33 | 33 | 32 | 32 | 31 | 31 | 30 | 29 | 29 | 28 | 27 | 24 | 21 | 18 | 15 | 12 | 9 | 6 | 3 | 0 |
| 54 | 35 | 34 | 34 | 33 | 33 | 32 | 32 | 31 | 30 | 29 | 29 | 27 | 24 | 21 | 18 | 15 | 12 | 9 | 6 | 3 | 0 |
| 55 | 36 | 36 | 35 | 35 | 34 | 33 | 33 | 32 | 31 | 30 | 30 | 27 | 24 | 21 | 18 | 15 | 12 | 9 | 6 | 3 | 0 |
| 56 | 38 | 37 | 37 | 36 | 35 | 34 | 34 | 33 | 32 | 31 | 30 | 27 | 24 | 21 | 18 | 15 | 12 | 9 | 6 | 3 | 0 |
| 57 | 39 | 39 | 38 | 37 | 37 | 36 | 35 | 34 | 33 | 32 | 31 | 28 | 25 | 22 | 19 | 16 | 13 | 10 | 7 | 4 | 0 |
| 58 | 41 | 40 | 40 | 39 | 38 | 37 | 36 | 34 | 33 | 32 | 31 | 28 | 25 | 22 | 19 | 16 | 13 | 10 | 7 | 4 | 0 |
| 59 | 43 | 42 | 41 | 40 | 39 | 37 | 36 | 34 | 33 | 32 | 31 | 28 | 25 | 22 | 19 | 16 | 13 | 10 | 7 | 4 | 0 |
| 60 | 45 | 43 | 42 | 40 | 39 | 37 | 36 | 34 | 33 | 32 | 30 | 27 | 24 | 21 | 18 | 15 | 12 | 9 | 6 | 3 | 0 |
| 61 | 45 | 43 | 41 | 40 | 38 | 37 | 35 | 34 | 33 | 31 | 30 | 27 | 24 | 21 | 18 | 15 | 12 | 9 | 6 | 3 | 0 |
| 62 | 45 | 43 | 41 | 40 | 38 | 37 | 35 | 34 | 33 | 31 | 30 | 27 | 24 | 21 | 18 | 15 | 12 | 9 | 6 | 3 | 0 |
| 63 | 45 | 43 | 41 | 40 | 38 | 37 | 35 | 34 | 32 | 31 | 30 | 27 | 24 | 21 | 18 | 15 | 12 | 9 | 6 | 3 | 0 |
| 64 | 44 | 43 | 41 | 39 | 38 | 36 | 35 | 34 | 32 | 31 | 30 | 27 | 24 | 21 | 18 | 15 | 12 | 9 | 6 | 3 | 0 |
| 65 | 44 | 43 | 41 | 39 | 38 | 36 | 35 | 34 | 32 | 31 | 30 | 27 | 24 | 21 | 18 | 15 | 12 | 9 | 6 | 3 | 0 |
| 66 | 44 | 42 | 41 | 39 | 38 | 36 | 35 | 34 | 32 | 31 | 30 | 27 | 24 | 21 | 18 | 15 | 12 | 9 | 6 | 3 | 0 |
| 67 | 44 | 42 | 41 | 39 | 38 | 36 | 35 | 33 | 32 | 31 | 30 | 27 | 24 | 21 | 18 | 15 | 12 | 9 | 6 | 3 | 0 |
| 68 | 44 | 42 | 41 | 39 | 38 | 36 | 35 | 33 | 32 | 30 | 29 | 27 | 24 | 21 | 18 | 15 | 12 | 9 | 6 | 3 | 0 |
| 69 | 44 | 42 | 40 | 39 | 37 | 36 | 35 | 33 | 32 | 30 | 29 | 27 | 24 | 21 | 18 | 15 | 12 | 9 | 6 | 3 | 0 |
| 70 | 44 | 42 | 40 | 39 | 37 | 36 | 34 | 33 | 31 | 30 | 29 | 27 | 24 | 21 | 18 | 15 | 12 | 9 | 6 | 3 | 0 |
| 71 | 43 | 42 | 40 | 39 | 37 | 36 | 34 | 32 | 31 | 29 | 29 | 27 | 24 | 21 | 18 | 15 | 12 | 9 | 6 | 3 | 0 |
| 72 | 43 | 42 | 40 | 38 | 37 | 35 | 34 | 32 | 31 | 29 | 28 | 26 | 24 | 21 | 18 | 15 | 12 | 9 | 6 | 3 | 0 |
| 73 | 43 | 42 | 40 | 38 | 37 | 35 | 33 | 32 | 30 | 29 | 28 | 26 | 24 | 21 | 18 | 15 | 12 | 9 | 6 | 3 | 0 |
| 74 | 43 | 41 | 40 | 38 | 37 | 35 | 33 | 32 | 30 | 29 | 28 | 26 | 24 | 21 | 18 | 15 | 12 | 9 | 6 | 3 | 0 |
| 75 | 43 | 41 | 40 | 38 | 36 | 35 | 33 | 31 | 30 | 28 | 28 | 26 | 24 | 21 | 18 | 15 | 12 | 9 | 6 | 3 | 0 |
| 76 | 43 | 41 | 40 | 38 | 36 | 35 | 33 | 31 | 30 | 28 | 28 | 26 | 24 | 21 | 18 | 15 | 12 | 9 | 6 | 3 | 0 |
| 77 | 43 | 41 | 40 | 38 | 36 | 34 | 33 | 31 | 30 | 28 | 27 | 25 | 23 | 21 | 18 | 15 | 12 | 9 | 6 | 3 | 0 |
| 78 | 43 | 41 | 39 | 38 | 36 | 34 | 33 | 31 | 29 | 28 | 27 | 25 | 23 | 21 | 18 | 15 | 12 | 9 | 6 | 3 | 0 |
| 79 | 43 | 41 | 39 | 38 | 36 | 34 | 33 | 31 | 29 | 28 | 27 | 25 | 23 | 21 | 18 | 15 | 12 | 9 | 6 | 3 | 0 |
| 80 | 43 | 41 | 39 | 38 | 36 | 34 | 32 | 31 | 29 | 27 | 27 | 25 | 23 | 21 | 18 | 15 | 12 | 9 | 6 | 3 | 0 |

1-175  06-188

## PAYMENT OF CASH VALUE AND LOANS

We may delay paying you the partial or full surrender values of this policy for up to six months after we receive your written request for the surrender. We may delay making a loan to you for up to six months after we receive your written request for the loan. We will not delay any loan made to pay premiums due us on any policy.

## POLICY STATEMENTS AND ILLUSTRATIONS

At least once a year, we will send you a statement showing the face amount, accumulation value, cash value, loans, partial surrenders, premiums paid and charges as of the statement date. We will provide you with an illustration of benefits and values at any time if you request it in writing. The first illustration is at no charge to you. We reserve the right to charge you a $25.00 administrative fee for each subsequent illustration.

## BASIS OF COMPUTATION

The cash values of the policy are not less than the minimum values required by the State in which this policy is delivered. The cash values are based on the guaranteed monthly deduction rates and the guaranteed interest rate. (See the Guaranteed Values section.)

Cash values will always meet or exceed minimum values on the statutory nonforfeiture basis. The basis for the extended term values is the Commissioners 1980 Extended Term Mortality Tables for males and females, age nearest birthday and 5.5% interest. The basis for all other values is the Commissioners 1980 Standard Ordinary Mortality Tables for males and females, age nearest birthday and 5.5% interest. Deaths are assumed to occur at the end of the policy year.

As required, we have filed the method we used to compute minimum cash values and nonforfeiture benefits with the Supervisory Official of the State in which this policy is delivered.

## GENERAL PROVISIONS

Incontestability of the Policy -- Except for fraud or nonpayment of premiums, this policy will be incontestable after it has been in force during the Insured's lifetime for two years from the date of issue. This provision does not apply to any rider providing benefits specifically for disability or death by accident.

Amount We Pay is Limited in the Event of Suicide -- If the Insured dies by suicide, while sane or insane, within two years from the date of issue, we will be liable only for the amount of premiums paid, less any partial surrenders.

Misstatement of Age or Sex in the Application -- If there is a misstatement of the Insured's age or sex in the policy, we will adjust the excess of the death benefit over the accumulation value to that which would be purchased by the most recent monthly deduction at the correct age or sex.

The Contract Consists of the Policy and Application -- We have issued this policy in consideration of the application and premium payments. A copy of the application is attached and is a part of this policy. The policy and the application together are the entire contract. All statements made by or for the insured will be considered Representations and not Warranties. We will not use any statement made by or for the Insured to deny a claim unless the statement is in the application and the application is attached to this policy when we issue it.

Who Can Make Changes in the Policy -- Only our President or a Vice President together with our Secretary have the authority to make any change in this policy. Any change must be in writing.

Termination of Insurance -- This policy will terminate at the earliest of:

1. the date of surrender;

2. the policy anniversary nearest the Insured's age 95; or

3. the date of lapse.

No Dividends are Payable -- This is nonparticipating insurance. It does not participate in our profits or surplus. We do not distribute past surplus or recover past losses by changing the monthly deduction rates.

The numbers in the chart show the portion of each Guaranteed Maximum Monthly Deduction Rate that represents cost of insurance and the portion that represents expenses. All figures in the chart are per thousand dollars of excess of death benefit over accumulation value.

### BREAKDOWN OF GUARANTEED MAXIMUM MONTHLY DEDUCTION RATES
### INTO COST OF INSURANCE AND EXPENSE COMPONENTS
### FOR STANDARD LIVES
### MALE SMOKER

| Attained Age | Monthly Deduction Rate | Cost of Insurance Portion | Expense Portion | Attained Age | Monthly Deduction Rate | Cost of Insurance Portion | Expense Portion |
|---|---|---|---|---|---|---|---|
| 0 | | | | 50 | 0.83 | 0.55 | 0.28 |
| 1 | | | | 51 | 0.91 | 0.60 | 0.31 |
| 2 | | | | 52 | 0.99 | 0.66 | 0.33 |
| 3 | | | | 53 | 1.08 | 0.72 | 0.36 |
| 4 | | | | 54 | 1.19 | 0.79 | 0.40 |
| 5 | | | | 55 | 1.30 | 0.87 | 0.43 |
| 6 | | | | 56 | 1.43 | 0.95 | 0.48 |
| 7 | | | | 57 | 1.56 | 1.04 | 0.52 |
| 8 | | | | 58 | 1.69 | 1.13 | 0.56 |
| 9 | | | | 59 | 1.84 | 1.23 | 0.61 |
| 10 | | | | 60 | 2.01 | 1.34 | 0.67 |
| 11 | | | | 61 | 2.19 | 1.46 | 0.73 |
| 12 | | | | 62 | 2.39 | 1.59 | 0.80 |
| 13 | | | | 63 | 2.63 | 1.75 | 0.88 |
| 14 | | | | 64 | 2.89 | 1.92 | 0.97 |
| 15 | | | | 65 | 3.17 | 2.11 | 1.06 |
| 16 | 0.18 | 0.12 | 0.06 | 66 | 3.48 | 2.32 | 1.16 |
| 17 | 0.20 | 0.13 | 0.07 | 67 | 3.80 | 2.53 | 1.27 |
| 18 | 0.22 | 0.14 | 0.08 | 68 | 4.14 | 2.76 | 1.38 |
| 19 | 0.23 | 0.15 | 0.08 | 69 | 4.52 | 3.01 | 1.51 |
| 20 | 0.23 | 0.15 | 0.08 | 70 | 4.93 | 3.29 | 1.64 |
| 21 | 0.23 | 0.15 | 0.08 | 71 | 5.41 | 3.60 | 1.81 |
| 22 | 0.23 | 0.15 | 0.08 | 72 | 5.95 | 3.97 | 1.98 |
| 23 | 0.23 | 0.15 | 0.08 | 73 | 6.58 | 4.38 | 2.20 |
| 24 | 0.22 | 0.15 | 0.07 | 74 | 7.27 | 4.84 | 2.43 |
| 25 | 0.22 | 0.14 | 0.08 | 75 | 8.02 | 5.34 | 2.68 |
| 26 | 0.21 | 0.14 | 0.07 | 76 | 8.81 | 5.87 | 2.94 |
| 27 | 0.21 | 0.14 | 0.07 | 77 | 9.64 | 6.42 | 3.22 |
| 28 | 0.21 | 0.14 | 0.07 | 78 | 10.48 | 6.99 | 3.49 |
| 29 | 0.21 | 0.14 | 0.07 | 79 | 11.38 | 7.58 | 3.80 |
| 30 | 0.21 | 0.14 | 0.07 | 80 | 12.35 | 8.23 | 4.12 |
| 31 | 0.22 | 0.14 | 0.08 | 81 | 13.43 | 8.95 | 4.48 |
| 32 | 0.22 | 0.15 | 0.07 | 82 | 14.65 | 9.77 | 4.88 |
| 33 | 0.23 | 0.15 | 0.08 | 83 | 16.03 | 10.68 | 5.35 |
| 34 | 0.25 | 0.16 | 0.09 | 84 | 17.53 | 11.68 | 5.85 |
| 35 | 0.26 | 0.17 | 0.09 | 85 | 19.11 | 12.74 | 6.37 |
| 36 | 0.28 | 0.18 | 0.10 | 86 | 20.76 | 13.84 | 6.92 |
| 37 | 0.30 | 0.20 | 0.10 | 87 | 22.44 | 14.96 | 7.48 |
| 38 | 0.32 | 0.21 | 0.11 | 88 | 24.15 | 16.10 | 8.05 |
| 39 | 0.34 | 0.23 | 0.11 | 89 | 25.91 | 17.27 | 8.64 |
| 40 | 0.37 | 0.25 | 0.12 | 90 | 27.72 | 18.48 | 9.24 |
| 41 | 0.41 | 0.27 | 0.14 | 91 | 29.62 | 19.74 | 9.88 |
| 42 | 0.44 | 0.29 | 0.15 | 92 | 31.68 | 21.12 | 10.56 |
| 43 | 0.48 | 0.32 | 0.16 | 93 | 34.01 | 22.67 | 11.34 |
| 44 | 0.52 | 0.34 | 0.18 | 94 | 36.98 | 24.65 | 12.23 |
| 45 | 0.56 | 0.37 | 0.19 | 95 | 41.24 | 27.49 | 13.75 |
| 46 | 0.61 | 0.41 | 0.20 | 96 | 48.06 | 32.04 | 16.02 |
| 47 | 0.66 | 0.44 | 0.22 | 97 | 60.02 | 40.01 | 20.01 |
| 48 | 0.71 | 0.47 | 0.24 | 98 | 82.24 | 54.83 | 27.41 |
| 49 | 0.77 | 0.51 | 0.26 | 99 | 83.33 | 83.33 | 0 |

The numbers in the chart show the portion of each Guaranteed Maximum Monthly Deduction Rate that represents cost of insurance and the portion that represents expenses. All figures in the chart are per thousand dollars of excess of death benefit over accumulation value.

### BREAKDOWN OF GUARANTEED MAXIMUM MONTHLY DEDUCTION RATES
### INTO COST OF INSURANCE AND EXPENSE COMPONENTS
### FOR STANDARD LIVES
### FEMALE SMOKER

| Attained Age | Monthly Deduction Rate | Cost of Insurance Portion | Expense Portion | Attained Age | Monthly Deduction Rate | Cost of Insurance Portion | Expense Portion |
|---|---|---|---|---|---|---|---|
| 0 | | | | 50 | 0.62 | 0.41 | 0.21 |
| 1 | | | | 51 | 0.66 | 0.44 | 0.22 |
| 2 | | | | 52 | 0.71 | 0.47 | 0.24 |
| 3 | | | | 53 | 0.76 | 0.51 | 0.25 |
| 4 | | | | 54 | 0.82 | 0.55 | 0.27 |
| 5 | | | | 55 | 0.88 | 0.59 | 0.29 |
| 6 | | | | 56 | 0.94 | 0.63 | 0.31 |
| 7 | | | | 57 | 1.00 | 0.66 | 0.34 |
| 8 | | | | 58 | 1.05 | 0.70 | 0.35 |
| 9 | | | | 59 | 1.11 | 0.74 | 0.37 |
| 10 | | | | 60 | 1.18 | 0.78 | 0.40 |
| 11 | | | | 61 | 1.26 | 0.84 | 0.42 |
| 12 | | | | 62 | 1.37 | 0.91 | 0.46 |
| 13 | | | | 63 | 1.50 | 1.00 | 0.50 |
| 14 | | | | 64 | 1.65 | 1.10 | 0.55 |
| 15 | | | | 65 | 1.82 | 1.21 | 0.61 |
| 16 | 0.11 | 0.07 | 0.04 | 66 | 2.00 | 1.33 | 0.67 |
| 17 | 0.11 | 0.07 | 0.04 | 67 | 2.17 | 1.45 | 0.72 |
| 18 | 0.12 | 0.08 | 0.04 | 68 | 2.35 | 1.57 | 0.78 |
| 19 | 0.12 | 0.08 | 0.04 | 69 | 2.54 | 1.69 | 0.85 |
| 20 | 0.13 | 0.08 | 0.05 | 70 | 2.76 | 1.84 | 0.92 |
| 21 | 0.13 | 0.08 | 0.05 | 71 | 3.02 | 2.01 | 1.01 |
| 22 | 0.13 | 0.09 | 0.04 | 72 | 3.35 | 2.23 | 1.12 |
| 23 | 0.13 | 0.09 | 0.04 | 73 | 3.76 | 2.50 | 1.26 |
| 24 | 0.14 | 0.09 | 0.05 | 74 | 4.24 | 2.82 | 1.42 |
| 25 | 0.14 | 0.09 | 0.05 | 75 | 4.78 | 3.18 | 1.60 |
| 26 | 0.14 | 0.09 | 0.05 | 76 | 5.37 | 3.58 | 1.79 |
| 27 | 0.15 | 0.10 | 0.05 | 77 | 6.00 | 4.00 | 2.00 |
| 28 | 0.15 | 0.10 | 0.05 | 78 | 6.68 | 4.45 | 2.23 |
| 29 | 0.16 | 0.10 | 0.06 | 79 | 7.41 | 4.94 | 2.47 |
| 30 | 0.16 | 0.11 | 0.05 | 80 | 8.24 | 5.49 | 2.75 |
| 31 | 0.17 | 0.11 | 0.06 | 81 | 9.20 | 6.13 | 3.07 |
| 32 | 0.18 | 0.12 | 0.06 | 82 | 10.30 | 6.86 | 3.44 |
| 33 | 0.18 | 0.12 | 0.06 | 83 | 11.56 | 7.71 | 3.85 |
| 34 | 0.19 | 0.13 | 0.06 | 84 | 12.97 | 8.65 | 4.32 |
| 35 | 0.20 | 0.13 | 0.07 | 85 | 14.51 | 9.67 | 4.84 |
| 36 | 0.22 | 0.14 | 0.08 | 86 | 16.16 | 10.77 | 5.39 |
| 37 | 0.23 | 0.15 | 0.08 | 87 | 17.91 | 11.94 | 5.97 |
| 38 | 0.25 | 0.17 | 0.08 | 88 | 19.77 | 13.80 | 6.59 |
| 39 | 0.27 | 0.18 | 0.09 | 89 | 21.74 | 14.49 | 7.25 |
| 40 | 0.30 | 0.20 | 0.10 | 90 | 23.84 | 15.89 | 7.95 |
| 41 | 0.33 | 0.22 | 0.11 | 91 | 26.10 | 17.40 | 8.70 |
| 42 | 0.35 | 0.23 | 0.12 | 92 | 28.60 | 19.06 | 9.54 |
| 43 | 0.38 | 0.25 | 0.13 | 93 | 31.43 | 20.95 | 10.48 |
| 44 | 0.41 | 0.27 | 0.14 | 94 | 34.91 | 23.27 | 11.64 |
| 45 | 0.44 | 0.29 | 0.15 | 95 | 39.66 | 26.44 | 13.22 |
| 46 | 0.47 | 0.31 | 0.16 | 96 | 46.96 | 31.31 | 15.65 |
| 47 | 0.50 | 0.33 | 0.17 | 97 | 59.37 | 39.58 | 19.79 |
| 48 | 0.54 | 0.36 | 0.18 | 98 | 81.98 | 54.65 | 27.33 |
| 49 | 0.57 | 0.38 | 0.19 | 99 | 83.33 | 83.33 | 0 |

## SETTLEMENT PROVISIONS

When the Insured dies, we will pay the death benefit in a lump sum unless you or the beneficiary choose a settlement option. You may choose a settlement option while the Insured is living. The beneficiary may choose a settlement option after the Insured has died. The beneficiary's right to choose will be subject to any settlement agreement in effect at the Insured's death.

You may also choose one of these options as a method of receiving the surrender or maturity proceeds, if any are available under this policy.

When we receive a satisfactory written request, we will pay the benefit according to one of these options:

**Option A: Instalments for a Guaranteed Period --** We will pay equal instalments for a guaranteed period of from one to thirty years. Each instalment will consist of part benefit and part interest. We will pay the instalments monthly, quarterly, semi-annually or annually, as requested. See Table A on page 17.

**Option B: Instalments for Life with a Guaranteed Period --** We will pay equal monthly instalments as long as the payee is living, but we will not make payments for less than the guaranteed period the payee chooses. The guaranteed period may be either 10 years or 20 years. We will pay the instalments monthly. See Table B on page 17.

**Option C: Benefit Deposited with Interest --** We will hold the benefit on deposit. It will earn interest at the annual interest rate we are paying as of the date of death, surrender or maturity. We will not pay less than 2 1/2% annual interest. We will pay the earned interest monthly, quarterly, semi-annually or annually, as requested. The payee may withdraw part or all of the benefit and earned interest at any time.

**Option D: Instalments of a Selected Amount --** We will pay instalments of a selected amount until we have paid the entire benefit and accumulated interest.

**Option E: Annuity --** We will use the benefit as a single premium to buy an annuity. The annuity may be payable to one or two payees. It may be payable for life with or without a guaranteed period, as requested. The annuity payment will not be less than what our current annuity contracts are then paying.

The payee may arrange any other method of settlement as long as we agree to it. The payee must be an individual receiving payment in his or her own right. There must be at least $1,000 available for any option and the amount of each instalment to each payee must be at least $10. If the benefit amount is not enough to meet these requirements, we will pay the benefit in a lump sum.

We will pay the first instalment under any option on the date of death, maturity or surrender, whichever applies. Any unpaid balance we hold under Options A, B or D will earn interest at the rate we are paying at the time of settlement. We will not pay less than 3% annual interest. Any benefit we hold will be combined with our general assets.

If the payee does not live to receive all guaranteed payments under Options A, B, D or E or any amount deposited under Option C, plus any accumulated interest, we will pay the remaining benefit as scheduled to the payee's estate. The payee may name and change a successor payee for any amount we would otherwise pay the payee's estate.

## TABLE A
### Instalments for Each $1,000 Payable under Option A

Multiply the Monthly Instalment by 11.83895 for Annual, by 5.96322 for Semi-Annual, or by 2.99263 for Quarterly Instalments.

| Guaranteed Period (Yrs.) | Monthly Instalment | Guaranteed Period (Yrs.) | Monthly Instalment | Guaranteed Period (Yrs.) | Monthly Instalment |
|---|---|---|---|---|---|
| 1 | $84.47 | 11 | $8.86 | 21 | $5.32 |
| 2 | 42.86 | 12 | 8.24 | 22 | 5.15 |
| 3 | 28.99 | 13 | 7.71 | 23 | 4.99 |
| 4 | 22.06 | 14 | 7.26 | 24 | 4.84 |
| 5 | 17.91 | 15 | 6.87 | 25 | 4.71 |
| 6 | 15.14 | 16 | 6.53 | 26 | 4.59 |
| 7 | 13.16 | 17 | 6.23 | 27 | 4.48 |
| 8 | 11.68 | 18 | 5.96 | 28 | 4.37 |
| 9 | 10.53 | 19 | 5.73 | 29 | 4.27 |
| 10 | 9.61 | 20 | 5.51 | 30 | 4.18 |

### TABLE B
### Monthly Instalment for Each $1,000 Payable under Option B

#### MALE PAYEE

| Age | 10 Yrs. | 20 Yrs. | Age | 10 Yrs. | 20 Yrs. | Age | 10 Yrs. | 20 Yrs. | Age | 10 Yrs. | 20 Yrs. | Age | 10 Yrs. | 20 Yrs. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11 | $2.90 | $2.89 | 26 | $3.20 | $3.19 | 41 | $3.77 | $3.71 | 56 | $4.92 | $4.59 | 71 | $7.27 | $5.42 |
| 12 | 2.91 | 2.91 | 27 | 3.22 | 3.21 | 42 | 3.82 | 3.76 | 57 | 5.03 | 4.66 | 72 | 7.48 | 5.45 |
| 13 | 2.93 | 2.92 | 28 | 3.25 | 3.24 | 43 | 3.88 | 3.81 | 58 | 5.15 | 4.73 | 73 | 7.68 | 5.46 |
| 14 | 2.94 | 2.94 | 29 | 3.28 | 3.27 | 44 | 3.94 | 3.86 | 59 | 5.27 | 4.80 | 74 | 7.88 | 5.48 |
| 15 | 2.96 | 2.96 | 30 | 3.31 | 3.30 | 45 | 4.00 | 3.91 | 60 | 5.40 | 4.87 | 75 | 8.08 | 5.49 |
| 16 | 2.98 | 2.97 | 31 | 3.34 | 3.33 | 46 | 4.07 | 3.97 | 61 | 5.53 | 4.94 | 76 | 8.27 | 5.50 |
| 17 | 3.00 | 2.99 | 32 | 3.38 | 3.36 | 47 | 4.14 | 4.02 | 62 | 5.68 | 5.00 | 77 | 8.46 | 5.50 |
| 18 | 3.01 | 3.01 | 33 | 3.41 | 3.39 | 48 | 4.21 | 4.08 | 63 | 5.83 | 5.07 | 78 | 8.63 | 5.51 |
| 19 | 3.03 | 3.03 | 34 | 3.45 | 3.43 | 49 | 4.28 | 4.14 | 64 | 5.98 | 5.13 | 79 | 8.79 | 5.51 |
| 20 | 3.05 | 3.05 | 35 | 3.49 | 3.46 | 50 | 4.36 | 4.20 | 65 | 6.15 | 5.18 | 80 | 8.94 | 5.51 |
| 21 | 3.08 | 3.07 | 36 | 3.53 | 3.50 | 51 | 4.44 | 4.26 | 66 | 6.32 | 5.24 | 81 | 9.07 | 5.51 |
| 22 | 3.10 | 3.09 | 37 | 3.57 | 3.54 | 52 | 4.53 | 4.32 | 67 | 6.50 | 5.28 | 82 | 9.18 | 5.51 |
| 23 | 3.12 | 3.11 | 38 | 3.62 | 3.58 | 53 | 4.62 | 4.39 | 68 | 6.68 | 5.33 | 83 | 9.28 | 5.51 |
| 24 | 3.14 | 3.14 | 39 | 3.67 | 3.62 | 54 | 4.71 | 4.46 | 69 | 6.88 | 5.36 | 84 | 9.36 | 5.51 |
| 25 | 3.17 | 3.16 | 40 | 3.72 | 3.67 | 55 | 4.81 | 4.52 | 70 | 7.07 | 5.40 | 85 | 9.42 | 5.51 |

#### FEMALE PAYEE

| Age | 10 Yrs. | 20 Yrs. | Age | 10 Yrs. | 20 Yrs. | Age | 10 Yrs. | 20 Yrs. | Age | 10 Yrs. | 20 Yrs. | Age | 10 Yrs. | 20 Yrs. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11 | $2.83 | $2.83 | 26 | $3.08 | $3.07 | 41 | $3.54 | $3.52 | 56 | $4.51 | $4.35 | 71 | $6.73 | $5.36 |
| 12 | 2.84 | 2.84 | 27 | 3.10 | 3.10 | 42 | 3.59 | 3.56 | 57 | 4.61 | 4.42 | 72 | 6.94 | 5.40 |
| 13 | 2.86 | 2.85 | 28 | 3.12 | 3.12 | 43 | 3.63 | 3.60 | 58 | 4.71 | 4.50 | 73 | 7.16 | 5.43 |
| 14 | 2.87 | 2.87 | 29 | 3.15 | 3.14 | 44 | 3.68 | 3.65 | 59 | 4.82 | 4.57 | 74 | 7.38 | 5.45 |
| 15 | 2.88 | 2.88 | 30 | 3.17 | 3.17 | 45 | 3.73 | 3.69 | 60 | 4.94 | 4.65 | 75 | 7.60 | 5.47 |
| 16 | 2.90 | 2.90 | 31 | 3.20 | 3.19 | 46 | 3.78 | 3.74 | 61 | 5.06 | 4.72 | 76 | 7.82 | 5.48 |
| 17 | 2.91 | 2.91 | 32 | 3.23 | 3.22 | 47 | 3.84 | 3.79 | 62 | 5.19 | 4.80 | 77 | 8.04 | 5.49 |
| 18 | 2.93 | 2.93 | 33 | 3.26 | 3.25 | 48 | 3.90 | 3.85 | 63 | 5.33 | 4.88 | 78 | 8.25 | 5.50 |
| 19 | 2.95 | 2.94 | 34 | 3.29 | 3.28 | 49 | 3.96 | 3.90 | 64 | 5.47 | 4.95 | 79 | 8.45 | 5.51 |
| 20 | 2.96 | 2.96 | 35 | 3.32 | 3.31 | 50 | 4.03 | 3.96 | 65 | 5.63 | 5.02 | 80 | 8.64 | 5.51 |
| 21 | 2.98 | 2.98 | 36 | 3.35 | 3.34 | 51 | 4.10 | 4.02 | 66 | 5.79 | 5.09 | 81 | 8.82 | 5.51 |
| 22 | 3.00 | 2.99 | 37 | 3.39 | 3.37 | 52 | 4.17 | 4.08 | 67 | 5.96 | 5.15 | 82 | 8.97 | 5.51 |
| 23 | 3.02 | 3.01 | 38 | 3.42 | 3.41 | 53 | 4.25 | 4.14 | 68 | 6.14 | 5.21 | 83 | 9.11 | 5.51 |
| 24 | 3.04 | 3.03 | 39 | 3.46 | 3.44 | 54 | 4.33 | 4.21 | 69 | 6.33 | 5.27 | 84 | 9.23 | 5.51 |
| 25 | 3.06 | 3.05 | 40 | 3.50 | 3.48 | 55 | 4.42 | 4.28 | 70 | 6.53 | 5.32 | 85 | 9.32 | 5.51 |

Ages younger than 11 are the same as shown for age 11, and ages older than 85 are the same as shown for age 85.

TRANSAMERICA LIFE INSURANCE COMPANY

370 - Non-Guaranteed Opinion for Exhibit 5

1

## STATEMENT OF NONGUARANTEED ELEMENTS

### TRANSAMERICA LIFE INSURANCE COMPANY

#### Exhibit 5 Interrogatory #3 as of 12/31/14

The following statements, answers to interrogatories, and actuarial opinion are in response to a "YES" answer to Question #3 on Page 13 of the 2014 NAIC blank. In some cases, the response addresses business assumed from an affiliated company via coinsurance.

This response covers the mortality charges, expense loading charges and interest credits to policyholder fund balances of single and periodic premium deferred annuities, universal life contracts, and deferred annuity riders; and renewal premiums on indeterminate premium contracts currently issued or in force. Determination procedures for the following are not covered by this response:

- dividends and coupons,

- charges or benefits that contractually follow a separate account result or defined index.

This response includes individually issued contracts as well as contracts issued under a "group" trust not having the discretion to select the insurer(s) on behalf of all individual insureds.

This response includes only those elements over which the company (or its affiliates via coinsurance) may by policy provisions exercise some current or future level of discretionary control. Many interest sensitive and indeterminate premium contracts contain minimum interest rate, maximum mortality charge, or maximum premium rate guarantees of either a temporary or permanent nature which the company must, as a matter of contract law, not violate.

For the purpose of this response, the nonguaranteed elements associated with different policy forms shall be considered distinct. In particular, nonguaranteed elements of a policy form first issued since the last statement was filed shall not be considered a "change" merely because its illustrated schedule of nonguaranteed elements is different from the illustrated or actual schedule of nonguaranteed elements on other policy forms.

For the purpose of this response, anticipated experience factors are those elements in the redetermination of non-guaranteed charges and benefits that reflect expected future experience. Examples of anticipated experience factors are: incidence and level of premium payments, mortality rates, investment income rates, termination rates, reinsurance results, tax rates, and expense rates.

*Divisions:*

| | |
|---|---|
| ADMS | AEGON Direct Marketing Services Division |
| L&P | Life and Protection Division |
| ES&P | Employer Services and Pensions Division |
| IS&R | Individual Savings and Retirement Division |

EXHIBIT B

## DETERMINATION PROCEDURES

Interest rates credited to policyholder accounts and cap or participation rates for equity indexed products are determined by each division's Interest Rate Committee or Portfolio Management Team. These committees are empowered by the Board of Directors to modify investment strategy, investment mix, and the rates credited as it deems necessary for current market and product conditions. The nonguaranteed elements are determined prospectively. These committees typically meet monthly but could meet more or less frequently as may be dictated by changing conditions.

Current mortality charges on universal life contracts are adjusted periodically utilizing company experience (where credible), applicable reinsurance rates, and/or intercompany data published by professional organizations such as the Society of Actuaries. Basic mortality data is adjusted as necessary to meet legal, regulatory, or competitive constraints imposed upon the company. The charges must also be consistent with the company's desired profit margins for the particular product under consideration.

For indeterminate premium products, a full schedule of current and anticipated premium rates is developed at the point of issue. Premium rate adjustments are considered when anticipated future experience foretells deviations from the original profit standards. The source of deviation (mortality, persistency, expense, etc.) is an important consideration in the rerating decision as well as the potential effect of a rate change on the future experience of the existing block of business.

Current expense loading charges anticipated are developed at the point of issue. Adjustments are considered when anticipated future experience foretells deviations from the original profit standards. The source of deviation (mortality, persistency, expense, etc.) is an important consideration in the adjustment decision as well as the potential effect of a change on the future experience of the existing block of business.

Experience rated group annuity contracts are credited with interest, retrospectively, in accordance with the investment year method.

For Universal Life and interest sensitive whole life contracts, credited interest rates are typically reviewed monthly, as are the caps for indexed universal life. These are adjusted as necessary to meet regulatory or competitive constraints, as well as being consistent with the company's desired profit margins for the particular product under consideration.

For retirement plan group annuity contracts, declared interest rates for the small employer market are reset every six months. Declared interest rates have been changed to reflect the investment results of the prior year and assumptions as to cash flow and investment returns available on new investments during the year for which rates are being declared.

## ADMS

Indeterminate Premium Life Insurance -- The company's policy is to review experience periodically and to adjust premiums based on expectations of future investment earnings, persistency, mortality and expenses. Contractually, premium adjustments may be made at the Company's sole discretion.

## INTERROGATORIES

1. **Since this statement was last filed, have there been any changes in the values of nonguaranteed elements on new or existing business authorized for illustration by reporting entity? If yes, describe the changes that were made.**

   RESPONSE:

   ADMS

   > No. There are no policies which are authorized for illustration by ADMS.

   L&P

   > Yes. Yes. Changes have been made to the nonguaranteed current interest rates credited and cap rates on certain interest sensitive products for both new and existing business.

   ES&P

   > Yes. Illustrated values on universal life insurance Bank Owned Life Insurance (BOLI) and Corporate Owned Life Insurance (COLI) sold by the Company reflect the actual interest rate being credited. On some policies there have been changes in COIs authorized for illustration.

   IS&R

   > Yes. Credited rates determined by a portfolio average approach have been adjusted to reflect changes in the yield of the portfolio of assets backing the liabilities.

2. **Since this statement was last filed, have there been any changes in the values of nonguaranteed elements actually charged or credited? If yes, describe the changes that were made.**

   RESPONSE: Yes.

   ADMS:

   > No changes.

   L&P

   > Yes. Changes have been made to the nonguaranteed credited interest rates on certain interest sensitive products. Changes also have been made to the cap on certain indexed universal life products.

   ES&P

   > The nonguaranteed credited rates have been changed to reflect changes in yields of the underlying investments and current and anticipated market and product conditions.

   IS&R

   > Yes. Credited rates determined by a portfolio average approach have been adjusted to reflect changes in the yield of the portfolio of assets backing the liabilities.

3.  **Indicate to what extent any changes described in 1 or 2 above vary from the policy and/or general methods and procedures last reported for the affected contracts.**

RESPONSE:  No changes.

4.  **Are the anticipated experience factors underlying any nonguaranteed elements different from current experience?  If yes, describe in general terms the ways in which future experience is anticipated to differ from current experience and the nonguaranteed element factors which are affected by such anticipation.**

RESPONSE:

ADMS

Yes. Some indeterminate premium life policies have anticipated experience factors which vary from current experience. No adjustments to premium rates are anticipated at this time.

All Other Divisions

Interest rates credited on a portfolio average approach reflect the recent historical experience of the underlying portfolio of assets. Interest rates credited on an investment generation approach are set with due consideration for asset turnover and anticipated reinvestment rates available over any contractual guarantee period.

Anticipated investment experience cannot be predicted under any reasonable degree of certainty; therefore anticipated investment experience is expected to vary (either higher or lower) from current experience.

5.  **State whether anticipated investment income experience factors are based on (a) a portfolio average approach, (b) an investment generation approach, or (c) other.  If (b) or (c), describe the general basis used, including the investment generation groupings.**

RESPONSE: Both portfolio average and investment generation methods are used.

ADMS

A portfolio average approach is used.

L&P

Both the investment generation method and the portfolio method are used. Many universal life and deferred annuity policies credit interest on a portfolio average basis. A larger portion of universal life policies credit interest on a modified investment generation approach. The investment generation method is an attempt to credit interest equitably among policyholders by crediting the same interest rate to all premiums received on the same day on all in-force policies and new issues of the same policy forms. Renewal rates are typically reviewed annually.

ES&P

The investment generation method is used for Bank Owned Life Insurance (BOLI) and Corporate Owned Life Insurance (COLI) business. The Company's BOLI and COLI business is generally comprised of large, single premium cases. As such in general, the credited rate for each case is initially determined based on the asset yield at the time premium is received less a spread to cover

the company's profit and expenses. Renewal rates are reset annually. Reinvestment rates are estimated and tracked for each case. The renewal credited rate is then set based on the estimated asset yield on investments for each case less the credited rate spread. Each case represents its own investment generation grouping.  For business not comprised of large, single premiums, premiums received are grouped by calendar quarter and investment rates are tracked by these groups rather than by case.

The majority of group annuity policies credit interest on a portfolio average basis.  Renewal rates are reset every six months. For a small portion of group annuities, the contract fund is allocated by calendar year of deposit. There are eleven cells for the past ten years and the eleventh is an aggregation for earlier years. During a particular year of review, the assets in the General Account are segregated by year of acquisition, and the performance of each of the eleven cells is measured. Each of the contract holder's eleven cells will be credited with interest at a rate derived from the performance of the corresponding cell of assets in the General Account during the year of review.

IS&R:

Nearly all deferred annuity policies credit interest on a modified investment generation approach. The credited rate for new money is based on the asset yield at the time premium is received less a spread to cover the company's profit and expenses. Renewal rates are reset annually.

For group annuities, the contract fund is allocated by calendar year of deposit. During a particular year of review, the assets in the General Account are segregated by year of acquisition, and the performance of each is measured. The contract holder is credited with interest rates derived from the performance of the corresponding assets in the General Account.

6. **Describe how the reporting entity allocates anticipated experience among its various classes of business.**

RESPONSE:

L&P:

The company conducts periodic mortality and persistency studies where experience is differentiated by type of product and/or distribution. For nonguaranteed mortality charges, current experience is used as a guide for anticipated future experience. Functional cost studies to determine operational expenses performed, would be used as a guide for changes to nonguaranteed expense charges.

All Other Divisions:

All of the classes have separate expense factors.

During product development, the anticipated cash flow of a product is analyzed under various future scenarios with respect to mortality, persistency, expenses, and interest rates. These cash flow studies together with experience studies are used to establish the schedule of mortality charges and the investment spread necessary to support company profit and surplus objectives. In addition, an investment strategy is established for the product which assists investment personnel in meeting cash flow, yield, liquidity, quality, and asset duration standards appropriate for the product.

Interest rates credited are maintained at a level approximately equal to the earned rate on the supporting assets less the target spread determined in the initial product development or by

subsequent actuarial investigation.   Regardless of the spread, interest rates are never less than the guaranteed interest rates in the policy forms.

For some annuity policies, a separate annuity portfolio is maintained within the Company's general account.

**7.  Does the undersigned believe there is substantial probability that illustrations authorized by the company to be presented on new or existing business cannot be supported by currently anticipated experience? If yes, indicate which classes and explain.**

RESPONSE:

ADMS

No. The company does not illustrate nonguaranteed elements.

All Other Divisions

Authorized illustrations can be supported by current experience. To the extent that interest rates are not predictable, there is a possibility that current illustrations are not supportable.

**8.  Describe any aspects of the determination of nonguaranteed elements not covered above that involve material departures from the actuarial principles and practices of the American Academy of Actuaries, applicable to the determination of nonguaranteed elements.**

RESPONSE:  There are no material departures from the actuarial principles and practices of the American Academy of Actuaries applicable to the determination of nonguaranteed elements.

## ACTUARIAL OPINION

I, Ronald E. Hauser, am a Senior Actuary in the Investments and Retirement division of Transamerica Life Insurance Company, and a member of the American Academy of Actuaries. I have examined the actuarial assumptions and methods used in determining nonguaranteed elements for the deferred annuities of the company's Individual Savings and Retirement unit used for delivery in the United States. The nonguaranteed elements included are those:

    i.     Paid, credited, charged, or determined in 2014; and

    ii.    Authorized by the reporting entity to be illustrated on new and existing business during 2014.

My examination included such review of the actuarial assumptions and methods of the underlying basic records and such tests of the actuarial calculations as I considered necessary. In my opinion, the nonguaranteed elements described above have been determined in accordance with generally accepted actuarial principles and practices applicable to the determination of nonguaranteed elements.


Ronald E. Hauser, FSA, MAAA
Senior Actuary
Transamerica Life Insurance Company
December 31, 2014

CONFIDENTIAL

## ACTUARIAL OPINION

I, Lee Hakert, am an Assistant Vice President and Illustration Actuary in the Investments & Retirement division of Transamerica Life Insurance Company, and a member of the American Academy of Actuaries. I have examined the actuarial assumptions and methods used in determining nonguaranteed elements for the BOLI/COLI, group annuity contracts, and tax qualified plans of the company's Employer Solutions and Pensions division used for delivery in the United States. The nonguaranteed elements included are those:

    i.      Paid, credited, charged, or determined in 2014; and

    ii.     Authorized by the reporting entity to be illustrated on new and existing business during 2014.

My examination included such review of the actuarial assumptions and methods of the underlying basic records and such tests of the actuarial calculations as I considered necessary. In my opinion, the nonguaranteed elements described above have been determined in accordance with generally accepted actuarial principles and practices applicable to the determination of nonguaranteed elements.


*Lee Hakert, FSA, MAAA*

Lee Hakert, FSA, MAAA
Assistant Vice President and Illustration Actuary
Transamerica Life Insurance Company
December 31st, 2014

## ACTUARIAL OPINION

I, John Daniel Mahoney, am an Actuary in the Life and Protection Division of Transamerica Life Insurance Company, and a member of the American Academy of Actuaries. I have examined the actuarial assumptions and methods used in determining nonguaranteed elements for the interest sensitive life and annuity products of the Life and Protection Division used for delivery in the United States. The nonguaranteed elements included are those:

    i.     Paid, credited, charged, or determined in 2014; and

    ii.    Authorized by the reporting entity to be illustrated on new and existing business during 2014.

My examination included such review of the actuarial assumptions and methods of the underlying basic records and such tests of the actuarial calculations as I considered necessary. In my opinion, the nonguaranteed elements described above have been determined in accordance with generally accepted actuarial principles and practices applicable to the determination of nonguaranteed elements.


John Daniel Mahoney
Actuary
Transamerica Life Insurance Company
12/31/2014

## ACTUARIAL OPINION

I, Nancy A. Manning, am an Associate Actuary in the Affinity Marketing Group Division of Transamerica Life Insurance Company and a member of the American Academy of Actuaries. I have examined the actuarial assumptions and methods used in determining nonguaranteed elements for the individual life insurance and annuity contracts of the company's Affinity Marketing Group Division used for delivery in the United States. The nonguaranteed elements included are those:

  i.    Paid, credited, charged, or determined in 2014; and

  ii.    Authorized by the reporting entity to be illustrated on new and existing business during 2014.

My examination included such review of the actuarial assumptions and methods of the underlying basic records and such tests of the actuarial calculations as I considered necessary. In my opinion, the nonguaranteed elements described above have been determined in accordance with generally accepted actuarial principles and practices applicable to the determination of nonguaranteed elements.


_Nancy A. Manning_

Nancy A. Manning, A.S.A., M.A.A.A.
Associate Actuary
Affinity Marketing Group Division
December 31, 2014

TRANSAMERICA LIFE INSURANCE COMPANY
370 - Non-Guaranteed Opinion for Exhibit 5

## STATEMENT OF NONGUARANTEED ELEMENTS

### TRANSAMERICA LIFE INSURANCE COMPANY

#### Exhibit 5 Interrogatory #3 as of 12/31/13

The following statements, answers to interrogatories, and actuarial opinion are in response to a "YES" answer to Question #3 on Page 13 of the 2013 NAIC blank. In some cases, the response addresses business assumed from an affiliated company via coinsurance.

This response covers the mortality charges, expense loading charges and interest credits to policyholder fund balances of single and periodic premium deferred annuities, universal life contracts, and deferred annuity riders; and renewal premiums on indeterminate premium contracts currently issued or in force. Determination procedures for the following are not covered by this response:

- dividends and coupons,
- charges or benefits that contractually follow a separate account result or defined index.

This response includes individually issued contracts as well as contracts issued under a "group" trust not having the discretion to select the insurer(s) on behalf of all individual insureds.

This response includes only those elements over which the company (or its affiliates via coinsurance) may by policy provisions exercise some current or future level of discretionary control. Many interest sensitive and indeterminate premium contracts contain minimum interest rate, maximum mortality charge, or maximum premium rate guarantees of either a temporary or permanent nature which the company must, as a matter of contract law, not violate.

For the purpose of this response, the nonguaranteed elements associated with different policy forms shall be considered distinct. In particular, nonguaranteed elements of a policy form first issued since the last statement was filed shall not be considered a "change" merely because its illustrated schedule of nonguaranteed elements is different from the illustrated or actual schedule of nonguaranteed elements on other policy forms.

For the purpose of this response, anticipated experience factors are those elements in the redetermination of non-guaranteed charges and benefits that reflect expected future experience. Examples of anticipated experience factors are: incidence and level of premium payments, mortality rates, investment income rates, termination rates, reinsurance results, tax rates, and expense rates.

*Divisions:*

| | |
|---|---|
| ADMS | AEGON Direct Marketing Services Division |
| L&P | Life and ProtectionProtection Division |
| ES&P | Employer Services and Pensions Division |
| IS&R | Individual Savings and Retirement Division |

EXHIBIT C

## DETERMINATION PROCEDURES

Interest rates credited to policyholder accounts and cap or participation rates for equity indexed products are determined by each division's Interest Rate Committee or Portfolio Management Team. These committees are empowered by the Board of Directors to modify investment strategy, investment mix, and the rates credited as it deems necessary for current market and product conditions. The nonguaranteed elements are determined prospectively. These committees typically meet monthly but could meet more or less frequently as may be dictated by changing conditions.

Current mortality charges on universal life contracts are adjusted periodically utilizing company experience (where credible), applicable reinsurance rates, and/or intercompany data published by professional organizations such as the Society of Actuaries. Basic mortality data is adjusted as necessary to meet legal, regulatory, or competitive constraints imposed upon the company. The charges must also be consistent with the company's desired profit margins for the particular product under consideration.

For indeterminate premium products, a full schedule of current and anticipated premium rates is developed at the point of issue. Premium rate adjustments are considered when anticipated future experience foretells deviations from the original profit standards. The source of deviation (mortality, persistency, expense, etc.) is an important consideration in the rerating decision as well as the potential effect of a rate change on the future experience of the existing block of business.

Current expense loading charges anticipated are developed at the point of issue. Adjustments are considered when anticipated future experience foretells deviations from the original profit standards. The source of deviation (mortality, persistency, expense, etc.) is an important consideration in the adjustment decision as well as the potential effect of a change on the future experience of the existing block of business.

Experience rated group annuity contracts are credited with interest, retrospectively, in accordance with the investment year method.

For Universal Life and interest sensitive whole life contracts, credited interest rates are typically reviewed monthly, as are the caps for indexed universal life. These are adjusted as necessary to meet regulatory or competitive constraints, as well as being consistent with the company's desired profit margins for the particular product under consideration.

For retirement plan group annuity contracts, declared interest rates for the small employer market are reset every six months. Declared interest rates have been changed to reflect the investment results of the prior year and assumptions as to cash flow and investment returns available on new investments during the year for which rates are being declared.

ADMS

Indeterminate Premium Life Insurance -- The company's policy is to review experience periodically and to adjust premiums based on expectations of future investment earnings, persistency, mortality and expenses. Contractually, premium adjustments may be made at the Company's sole discretion.

## INTERROGATORIES

1. **Since this statement was last filed, have there been any changes in the values of nonguaranteed elements on new or existing business authorized for illustration by reporting entity?  If yes, describe the changes that were made.**

   RESPONSE:

   ADMS

      No.  There are no policies which are authorized for illustration by ADMS.

   L&P

      Yes.  Changes have been made to the nonguaranteed current interest rates credited, current mortality charges,  and illustrated rates on certain interest sensitive  products for both new and existing business.

   ES&P

      Yes.  Illustrated values on universal life insurance Bank Owned Life Insurance (BOLI) and Corporate Owned Life Insurance (COLI) sold by the Company reflect the actual interest rate being credited.  On some policies there have been changes in COIs authorized for illustration.

   IS&R

      Yes.  Credited rates determined by a portfolio average approach have been adjusted to reflect changes in the yield of the portfolio of assets backing the liabilities.

2. **Since this statement was last filed, have there been any changes in the values of nonguaranteed elements actually charged or credited?  If yes, describe the changes that were made.**

   RESPONSE: Yes.

   ADMS:

      No changes.

   L&P

      Yes.  Changes have been made to the nonguaranteed credited interest rates on certain interest sensitive products.   Changes also have been made to the current mortality charges on certain products.

   ES&P

      The nonguaranteed credited rates have been changed to reflect changes in yields of the underlying investments and current and anticipated market and product conditions.

   IS&R

      Yes.  Credited rates determined by a portfolio average approach have been adjusted to reflect changes in the yield of the portfolio of assets backing the liabilities.

3. **Indicate to what extent any changes described in 1 or 2 above vary from the policy and/or general methods and procedures last reported for the affected contracts.**

   RESPONSE:  No changes.

4. **Are the anticipated experience factors underlying any nonguaranteed elements different from current experience?  If yes, describe in general terms the ways in which future experience is anticipated to differ from current experience and the nonguaranteed element factors which are affected by such anticipation.**

   RESPONSE:

   ADMS

   > Yes. Some indeterminate premium life policies have anticipated experience factors which vary from current experience.

   All Other Divisions

   > Interest rates credited on a portfolio average approach reflect the recent historical experience of the underlying portfolio of assets. Interest rates credited on an investment generation approach are set with due consideration for asset turnover and anticipated reinvestment rates available over any contractual guarantee period.

   > Anticipated investment experience cannot be predicted under any reasonable degree of certainty; therefore anticipated investment experience is expected to vary (either higher or lower) from current experience.

5. **State whether anticipated investment income experience factors are based on (a) a portfolio average approach, (b) an investment generation approach, or (c) other.  If (b) or (c), describe the general basis used, including the investment generation groupings.**

   RESPONSE: Both portfolio average and investment generation methods are used.

   ADMS

   > A portfolio average approach is used.

   L&P

   > Both the investment generation method and the portfolio method are used. Many universal life and deferred annuity policies credit interest on a portfolio average basis. A larger portion of universal life policies credit interest on a modified investment generation approach. The investment generation method is an attempt to credit interest equitably among policyholders by crediting the same interest rate to all premiums received on the same day on all in-force policies and new issues of the same policy forms. Renewal rates are typically reviewed annually.

   ES&P

   > The investment generation method is used for Bank Owned Life Insurance (BOLI) and Corporate Owned Life Insurance (COLI) business. The Company's BOLI and COLI business is generally comprised of large, single premium cases. As such in general, the credited rate for each case is initially determined based on the asset yield at the time premium is received less a spread to cover

the company's profit and expenses. Renewal rates are reset annually. Reinvestment rates are estimated and tracked for each case. The renewal credited rate is then set based on the estimated asset yield on investments for each case less the credited rate spread. Each case represents its own investment generation grouping. For business not comprised of large, single premiums, premiums received are grouped by calendar quarter and investment rates are tracked by these groups rather than by case.

The majority of group annuity policies credit interest on a portfolio average basis. Renewal rates are reset every six months. For a small portion of group annuities, the contract fund is allocated by calendar year of deposit. There are eleven cells for the past ten years and the eleventh is an aggregation for earlier years. During a particular year of review, the assets in the General Account are segregated by year of acquisition, and the performance of each of the eleven cells is measured. Each of the contract holder's eleven cells will be credited with interest at a rate derived from the performance of the corresponding cell of assets in the General Account during the year of review.

IS&R:

Nearly all deferred annuity policies credit interest on a modified investment generation approach. The credited rate for new money is based on the asset yield at the time premium is received less a spread to cover the company's profit and expenses. Renewal rates are reset annually.

For group annuities, the contract fund is allocated by calendar year of deposit. During a particular year of review, the assets in the General Account are segregated by year of acquisition, and the performance of each is measured. The contract holder is credited with interest rates derived from the performance of the corresponding assets in the General Account.

6.  **Describe how the reporting entity allocates anticipated experience among its various classes of business.**

RESPONSE:

L&P:

The company conducts periodic mortality and persistency studies where experience is differentiated by type of product and/or distribution. For nonguaranteed mortality charges, current experience is used as a guide for anticipated future experience. Functional cost studies to determine operational expenses performed, would be used as a guide for nonguaranteed expense charges.

All Other Divisions:

All of the classes have separate expense factors.

During product development, the anticipated cash flow of a product is analyzed under various future scenarios with respect to mortality, persistency, expenses, and interest rates. These cash flow studies together with experience studies are used to establish the schedule of mortality charges and the investment spread necessary to support company profit and surplus objectives. In addition, an investment strategy is established for the product which assists investment personnel in meeting cash flow, yield, liquidity, quality, and asset duration standards appropriate for the product.

Interest rates credited are maintained at a level approximately equal to the earned rate on the supporting assets less the target spread determined in the initial product development or by

subsequent actuarial investigation. Regardless of the spread, interest rates are never less than the guaranteed interest rates in the policy forms.

For some annuity policies, a separate annuity portfolio is maintained within the Company's general account.

**7. Does the undersigned believe there is substantial probability that illustrations authorized by the company to be presented on new or existing business cannot be supported by currently anticipated experience? If yes, indicate which classes and explain.**

RESPONSE:

ADMS

No. The company does not illustrate nonguaranteed elements.

All Other Divisions

Authorized illustrations can be supported by current experience. To the extent that interest rates are not predictable, there is a possibility that current illustrations are not supportable.

**8. Describe any aspects of the determination of nonguaranteed elements not covered above that involve material departures from the actuarial principles and practices of the American Academy of Actuaries, applicable to the determination of nonguaranteed elements.**

RESPONSE: There are no material departures from the actuarial principles and practices of the American Academy of Actuaries applicable to the determination of nonguaranteed elements.

## ACTUARIAL OPINION

I, Nancy A. Manning, am an Associate Actuary in the AEGON Direct Marketing Services Division of Transamerica Life Insurance Company, and a member of the American Academy of Actuaries. I have examined the actuarial assumptions and methods used in determining nonguaranteed elements for the individual life insurance and annuity contracts of the company's AEGON Direct Marketing Services Division used for delivery in the United States. The nonguaranteed elements included are those:

    i.      Paid, credited, charged, or determined in 2013; and

    ii.     Authorized by the reporting entity to be illustrated on new and existing business during 2013.

My examination included such review of the actuarial assumptions and methods of the underlying basic records and such tests of the actuarial calculations as I considered necessary. In my opinion, the nonguaranteed elements described above have been determined in accordance with generally accepted actuarial principles and practices applicable to the determination of nonguaranteed elements.


Nancy A. Manning, A.S.A., M.A.A.A.
Associate Actuary
ADMS
December 31, 2013

## ACTUARIAL OPINION

I, John Daniel Mahoney, am an Actuary in the Life and Protection Division of Transamerica Life Insurance Company, and a member of the American Academy of Actuaries. I have examined the actuarial assumptions and methods used in determining nonguaranteed elements for the interest sensitive life and annuity products of the Life and Protection Division used for delivery in the United States. The nonguaranteed elements included are those:

    i.      Paid, credited, charged, or determined in 2013; and

    ii.     Authorized by the reporting entity to be illustrated on new and existing business during 2013.

My examination included such review of the actuarial assumptions and methods of the underlying basic records and such tests of the actuarial calculations as I considered necessary. In my opinion, the nonguaranteed elements described above have been determined in accordance with generally accepted actuarial principles and practices applicable to the determination of nonguaranteed elements.


_____

John Daniel Mahoney
Actuary
Transamerica Life Insurance Company
12/31/2013

## ACTUARIAL OPINION

I, Benjamin Steward Wadsley, FSA, MAAA, am a Chief Actuary in the Employer Solutions and Pensions division of Transamerica Life Insurance Company, and a member of the American Academy of Actuaries. I have examined the actuarial assumptions and methods used in determining nonguaranteed elements for the BOLI/COLI, group annuity contracts, and tax qualified plans of the company's Employer Solutions and Pensions division used for delivery in the United States. The nonguaranteed elements included are those:

    i.      Paid, credited, charged, or determined in 2013; and

    ii.     Authorized by the reporting entity to be illustrated on new and existing business during 2013.

My examination included such review of the actuarial assumptions and methods of the underlying basic records and such tests of the actuarial calculations as I considered necessary. In my opinion, the nonguaranteed elements described above have been determined in accordance with generally accepted actuarial principles and practices applicable to the determination of nonguaranteed elements.


Benjamin Steward Wadsley, FSA, MAAA
Chief Actuary, ES&P
Transamerica Life Insurance Company
Employer Solutions and Pensions Division
4333 Edgewood Rd NE, MD 2390
Cedar Rapids, IA 52499
(319) 355-2892

December 31, 2013

## ACTUARIAL OPINION

I, Ronald E. Hauser, am a Senior Actuary in the Individual Savings and Retirement division of Transamerica Life Insurance Company, and a member of the American Academy of Actuaries. I have examined the actuarial assumptions and methods used in determining nonguaranteed elements for the deferred annuities of the company's Transamerica Capital Management used for delivery in the United States. The nonguaranteed elements included are those:

    i.      Paid, credited, charged, or determined in 2013; and

    ii.     Authorized by the reporting entity to be illustrated on new and existing business during 2013.

My examination included such review of the actuarial assumptions and methods of the underlying basic records and such tests of the actuarial calculations as I considered necessary. In my opinion, the nonguaranteed elements described above have been determined in accordance with generally accepted actuarial principles and practices applicable to the determination of nonguaranteed elements.

Ronald E. Hauser, FSA, MAAA
Senior Actuary
Transamerica Life Insurance Company
December 31, 2013

TRANSAMERICA LIFE INSURANCE COMPANY
370 - Non-Guaranteed Opinion for Exhibit 5

**STATEMENT OF NONGUAR.**

TRANSAMERICA LIFE INSURANCE COMPANY

Exhibit 5 Interrogatory #3 as of 12/31/12

The following statements, answers to interrogatories, and actuarial opinion are in response to a "YES" answer to Question #3 on Page 13 of the 2012 NAIC blank. In some cases, the response addresses business assumed from an affiliated company via coinsurance.

This response covers the mortality charges, expense loading charges and interest credits to policyholder fund balances of single and periodic premium deferred annuities, universal life contracts, and deferred annuity riders; and renewal premiums on indeterminate premium contracts currently issued or in force. Determination procedures for the following are not covered by this response:

- dividends and coupons,

- charges or benefits that contractually follow a separate account result or defined index.

This response includes individually issued contracts as well as contracts issued under a "group" trust not having the discretion to select the insurer(s) on behalf of all individual insureds.

This response includes only those elements over which the company (or its affiliates via coinsurance) may by policy provisions exercise some current or future level of discretionary control. Many interest sensitive and indeterminate premium contracts contain minimum interest rate, maximum mortality charge, or maximum premium rate guarantees of either a temporary or permanent nature which the company must, as a matter of contract law, not violate.

For the purpose of this response, the nonguaranteed elements associated with different policy forms shall be considered distinct. In particular, nonguaranteed elements of a policy form first issued since the last statement was filed shall not be considered a "change" merely because its illustrated schedule of nonguaranteed elements is different from the illustrated or actual schedule of nonguaranteed elements on other policy forms.

For the purpose of this response, anticipated experience factors are those elements in the redetermination of non-guaranteed charges and benefits that reflect expected future experience. Examples of anticipated experience factors are: incidence and level of premium payments, mortality rates, investment income rates, termination rates, reinsurance results, tax rates, and expense rates.

*Divisions:*

| | |
|---|---|
| ADMS | AEGON Direct Marketing Services Division |
| AFP | AEGON Financial Partners Division |
| ES&P | Employer Services and Pensions Division |
| IS&R | Individual Savings and Retirement Division |

EXHIBIT D

## DETERMINATION PROCEDURES

Interest rates credited to policyholder accounts and cap or participation rates for equity indexed products are determined by each division's Interest Rate Committee or Portfolio Management Team. These committees are empowered by the Board of Directors to modify investment strategy, investment mix, and the rates credited as it deems necessary for current market and product conditions. The nonguaranteed elements are determined prospectively. These committees typically meet monthly but could meet more or less frequently as may be dictated by changing conditions.

Current mortality charges on universal life contracts are determined periodically from company experience (where credible), applicable reinsurance rates, and from intercompany data published by professional organizations such as the Society of Actuaries. Basic mortality data is adjusted as necessary to meet legal, regulatory, or competitive constraints imposed upon the company. The charges must also be consistent with the company's desired profit margins for the particular product under consideration.

For indeterminate premium products, a full schedule of current and anticipated premium rates is developed at the point of issue. Premium rate adjustments are considered when anticipated future experience foretells deviations from the original profit standards. The source of deviation (mortality, persistency, expense, etc.) is an important consideration in the rerating decision as well as the potential effect of a rate change on the future experience of the existing block of business.

Current expense loading charges anticipated are developed at the point of issue. Adjustments are considered when anticipated future experience foretells deviations from the original profit standards. The source of deviation (mortality, persistency, expense, etc.) is an important consideration in the adjustment decision as well as the potential effect of a change on the future experience of the existing block of business.

Experience rated group annuity contracts are credited with interest, retrospectively, in accordance with the investment year method.

For Universal Life and interest sensitive whole life contracts, credited interest rates are typically reviewed monthly. These are adjusted as necessary to meet regulatory or competitive constraints, as well as being consistent with the company's desired profit margins for the particular product under consideration.

For retirement plan group annuity contracts, declared interest rates for the small employer market are reset every six months. Declared interest rates have been changed to reflect the investment results of the prior year and assumptions as to cash flow and investment returns available on new investments during the year for which rates are being declared.

## INTERROGATORIES

1. **Since this statement was last filed, have there been any changes in the values of nonguaranteed elements on new or existing business authorized for illustration by reporting entity? If yes, describe the changes that were made.**

   RESPONSE:

   ADMS

      No. There are no policies which are authorized for illustration by ADMS.

   AFP

      Yes. Changes have been made to the nonguaranteed current interest rates credited and illustrated rates on certain interest sensitive products for both new and existing business.

   ES&P

      Yes. Illustrated values on universal life insurance Bank Owned Life Insurance (BOLI) and Corporate Owned Life Insurance (COLI) sold by the Company reflect the actual interest rate being credited. Actual credited interest rates have been changed to reflect changes in yields of the underlying investments and current and anticipated market and product conditions.

      IS&R Yes. Credited rates determined by a portfolio average approach have been adjusted to reflect changes in the yield of the portfolio of assets backing the liabilities.

2. **Since this statement was last filed, have there been any changes in the values of nonguaranteed elements actually charged or credited? If yes, describe the changes that were made.**

   RESPONSE: Yes.

   ADMS:

      No changes.

   AFP

      Yes. Changes have been made to the nonguaranteed credited interest rates on certain interest sensitive products.

   ES&P

      The nonguaranteed credited rates have been changed to reflect changes in yields of the underlying investments and current and anticipated market and product conditions.

      IS&R Yes. Credited rates determined by a portfolio average approach have been adjusted to reflect changes in the yield of the portfolio of assets backing the liabilities.

3. **Indicate to what extent any changes described in 1 or 2 above vary from the policy and/or general methods and procedures last reported for the affected contracts.**

RESPONSE: No changes.

4. **Are the anticipated experience factors underlying any nonguaranteed elements different from current experience? If yes, describe in general terms the ways in which future experience is anticipated to differ from current experience and the nonguaranteed element factors which are affected by such anticipation.**

RESPONSE:

ADMS

Some indeterminate premium life policies have anticipated experience factors which vary from current experience.

All Other Divisions

Interest rates credited on a portfolio average approach reflect the recent historical experience of the underlying portfolio of assets. Interest rates credited on an investment generation approach are set with due consideration for asset turnover and anticipated reinvestment rates available over any contractual guarantee period.

Anticipated investment experience cannot be predicted under any reasonable degree of certainty; therefore anticipated investment experience is expected to vary (either higher or lower) from current experience.

5. **State whether anticipated investment income experience factors are based on (a) a portfolio average approach, (b) an investment generation approach, or (c) other. If (b) or (c), describe the general basis used, including the investment generation groupings.**

RESPONSE: Both portfolio average and investment generation methods are used.

ADMS

A portfolio average approach is used.

AFP

Both the investment generation method and the portfolio method are used. Many universal life and deferred annuity policies credit interest on a portfolio average basis. A larger portion of universal life policies credit interest on a modified investment generation approach. The investment generation method is an attempt to credit interest equitably among policyholders by crediting the same interest rate to all premiums received on the same day on all in-force policies and new issues of the same policy forms. Renewal rates are typically reviewed annually.

ES&P

The investment generation method is used for Bank Owned Life Insurance (BOLI) and Corporate Owned Life Insurance (COLI) business. The Company's BOLI and COLI business is generally comprised of large, single premium cases. As such, the credited rate for each case is initially determined based on the asset yield at the time premium is received less a spread to cover the company's profit and expenses. Renewal rates are reset annually. Reinvestment rates are estimated and tracked for each case. The renewal credited rate is then set based on the estimated asset yield

on investments for each case less the credited rate spread. Each case represents its own investment generation grouping. For business not comprised of large, single premiums, premiums received are grouped by calendar quarter and investment rates are tracked by these groups rather than by case.

The majority of group annuity policies credit interest on a portfolio average basis. Renewal rates are reset every six months. For a small portion of group annuities, the contract fund is allocated by calendar year of deposit. There are eleven cells for the past ten years and the eleventh is an aggregation for earlier years. During a particular year of review, the assets in the General Account are segregated by year of acquisition, and the performance of each of the eleven cells is measured. Each of the contract holder's eleven cells will be credited with interest at a rate derived from the performance of the corresponding cell of assets in the General Account during the year of review.

For the universal life products, interest is credited on a portfolio average basis.

IS&R:

Nearly all deferred annuity policies credit interest on a modified investment generation approach. The credited rate for new money is based on the asset yield at the time premium is received less a spread to cover the company's profit and expenses. Renewal rates are reset annually.

For group annuities, the contract fund is allocated by calendar year of deposit. During a particular year of review, the assets in the General Account are segregated by year of acquisition, and the performance of each is measured. The contract holder is credited with interest rates derived from the performance of the corresponding assets in the General Account.

6. **Describe how the reporting entity allocates anticipated experience among its various classes of business.**

RESPONSE:

AFP:

The company conducts periodic mortality and persistency studies where experience is differentiated by type of product and/or distribution. For nonguaranteed mortality charges, current experience is used as a guide for anticipated future experience. Functional cost studies to determine operational expenses performed, would be used as a guide for nonguaranteed expense charges.

All Other Divisions:

All of the classes have separate expense factors.

During product development, the anticipated cash flow of a product is analyzed under various future scenarios with respect to mortality, persistency, expenses, and interest rates. These cash flow studies together with experience studies are used to establish the schedule of mortality charges and the investment spread necessary to support company profit and surplus objectives. In addition, an investment strategy is established for the product which assists investment personnel in meeting cash flow, yield, liquidity, quality, and asset duration standards appropriate for the product.

Interest rates credited are maintained at a level approximately equal to the earned rate on the supporting assets less the target spread determined in the initial product development or by

subsequent actuarial investigation.   Regardless of the spread, interest rates are never less than the guaranteed interest rates in the policy forms.

For some annuity policies, a separate annuity portfolio is maintained within the Company's general account.

7.   **Does the undersigned believe there is substantial probability that illustrations authorized by the company to be presented on new or existing business cannot be supported by currently anticipated experience?  If yes, indicate which classes and explain.**

RESPONSE:

ADMS

No.  The company does not illustrate nonguaranteed elements.

All Other Divisions

Authorized illustrations can be supported by current experience. To the extent that interest rates are not predictable, there is a possibility that current illustrations are not supportable.

8.   **Describe any aspects of the determination of nonguaranteed elements not covered above that involve material departures from the actuarial principles and practices of the American Academy of Actuaries, applicable to the determination of nonguaranteed elements.**

RESPONSE:  There are no material departures from the actuarial principles and practices of the American Academy of Actuaries applicable to the determination of nonguaranteed elements.

## ACTUARIAL OPINION

I, Scott Hedgepeth, am an Assistant Vice President and Actuary in the AEGON Direct Marketing Services Division of Transamerica Life Insurance Company, and a Member of the American Academy of Actuaries. I have examined the actuarial assumptions and methods used in determining nonguaranteed elements for the life insurance and annuity policies of the AEGON Direct Marketing Services Division business within Transamerica Life Insurance Company used for delivery in the United States. The nonguaranteed elements included are those:

     i.      Paid, credited, charged, or determined in 2012; and

     ii.     Authorized by the Company to be illustrated on new and existing business during 2012.

My examination included such review of the actuarial assumptions and methods of the underlying basic records and such tests of the actuarial calculations as I considered necessary. In my opinion the nonguaranteed elements described above have been determined in accordance with generally accepted actuarial principles and practices applicable to the determination of nonguaranteed elements.

_____

Scott Hedgepeth, F.S.A., M.A.A.A.
Assistant Vice President and Actuary
ADMS
December 31, 2012

## **ACTUARIAL OPINION**

I, John Daniel Mahoney, am an Actuary in the AEGON Financial Partners Division of Transamerica Life Insurance Company, and a member of the American Academy of Actuaries. I have examined the actuarial assumptions and methods used in determining nonguaranteed elements for the interest sensitive life and annuity products of the AEGON Financial Partners Division used for delivery in the United States. The nonguaranteed elements included are those:

     i.     Paid, credited, charged, or determined in 2012; and

     ii.    Authorized by the reporting entity to be illustrated on new and existing business during 2012.

My examination included such review of the actuarial assumptions and methods of the underlying basic records and such tests of the actuarial calculations as I considered necessary. In my opinion, the nonguaranteed elements described above have been determined in accordance with generally accepted actuarial principles and practices applicable to the determination of nonguaranteed elements.


_____
John Daniel Mahoney
Actuary
Transamerica Life Insurance Company
12/31/2012

## ACTUARIAL OPINION

I, Paul Hance, FSA, MAAA, am a Vice President and Actuary in the Employer Solutions and Pensions Division of Transamerica Life Insurance Company, and a member of the American Academy of Actuaries. I have examined the actuarial assumptions and methods used in determining nonguaranteed elements for the universal life contracts, BOLI/COLI contracts, group annuity contracts and 401K plans of the Employer Solutions and Pensions Division used for delivery in the United States. The nonguaranteed elements included are those:

    i.      Paid, credited, charged, or determined in 2012; and

    ii.     Authorized by the reporting entity to be illustrated on new and existing business during 2012.

My examination included such review of the actuarial assumptions and methods of the underlying basic records and such tests of the actuarial calculations as I considered necessary. In my opinion, the nonguaranteed elements described above have been determined in accordance with generally accepted actuarial principles and practices applicable to the determination of nonguaranteed elements.


Paul Hance, FSA, MAAA
Vice President and Actuary
Transamerica Life Insurance Company
Employer Solutions and Pensions Division
1150 S Olive St., T-07-01
Los Angeles, CA 90015
(213) 742-2022

December 31, 2012

## ACTUARIAL OPINION

I, Ronald E. Hauser, am a Senior Actuary in the Individual Savings and Retirement division of Transamerica Life Insurance Company, and a member of the American Academy of Actuaries. I have examined the actuarial assumptions and methods used in determining nonguaranteed elements for the deferred annuities of the company's Transamerica Capital Management used for delivery in the United States. The nonguaranteed elements included are those:

    i.       Paid, credited, charged, or determined in 2012; and

    ii.      Authorized by the reporting entity to be illustrated on new and existing business during 2012.

My examination included such review of the actuarial assumptions and methods of the underlying basic records and such tests of the actuarial calculations as I considered necessary. In my opinion, the nonguaranteed elements described above have been determined in accordance with generally accepted actuarial principles and practices applicable to the determination of nonguaranteed elements.

Ronald E. Hauser, FSA, MAAA
Senior Actuary
Transamerica Life Insurance Company
December 31, 2012

**STATEMENT OF NONGUAR...**

TRANSAMERICA LIFE INSURANCE COMPANY
370 - Non-Guaranteed Opinion for Exhibit 5

TRANSAMERICA LIFE INSURANCE COMPANY

Exhibit 5 Interrogatory #3 as of 12/31/11

The following statements, answers to interrogatories, and actuarial opinion are in response to a "YES" answer to Question #3 on Page 13 of the 2011 NAIC blank. In some cases, the response addresses business assumed from an affiliated company via coinsurance.

This response covers the mortality charges, expense loading charges and interest credits to policyholder fund balances of single and periodic premium deferred annuities, universal life contracts, and deferred annuity riders; and renewal premiums on indeterminate premium contracts currently issued or in force. Determination procedures for the following are not covered by this response:

- dividends and coupons,
- charges or benefits that contractually follow a separate account result or defined index.

This response includes individually issued contracts as well as contracts issued under a "group" trust not having the discretion to select the insurer(s) on behalf of all individual insureds.

This response includes only those elements over which the company (or its affiliates via coinsurance) may by policy provisions exercise some current or future level of discretionary control. Many interest sensitive and indeterminate premium contracts contain minimum interest rate, maximum mortality charge, or maximum premium rate guarantees of either a temporary or permanent nature which the company must, as a matter of contract law, not violate.

For the purpose of this response, the nonguaranteed elements associated with different policy forms shall be considered distinct. In particular, nonguaranteed elements of a policy form first issued since the last statement was filed shall not be considered a "change" merely because its illustrated schedule of nonguaranteed elements is different from the illustrated or actual schedule of nonguaranteed elements on other policy forms.

For the purpose of this response, anticipated experience factors are those elements in the redetermination of non-guaranteed charges and benefits that reflect expected future experience. Examples of anticipated experience factors are: incidence and level of premium payments, mortality rates, investment income rates, termination rates, reinsurance results, tax rates, and expense rates.

*Divisions:*

| | |
|---|---|
| ADMS | AEGON Direct Marketing Services Division |
| AFP | AEGON Financial Partners Division |
| ES&P | Employer Services and Pensions Division |
| TCM | Transamerica Capital Management Division |

EXHIBIT E

## DETERMINATION PROCEDURES

Interest rates credited to policyholder accounts and cap or participation rates for equity indexed products are determined by each division's Interest Rate Committee or Portfolio Management Team. These committees are empowered by the Board of Directors to modify investment strategy, investment mix, and the rates credited as it deems necessary for current market and product conditions. The nonguaranteed elements are determined prospectively. These committees meet monthly or more frequently as may be dictated by changing conditions.

Current mortality charges on universal life contracts are determined periodically from company experience (where credible) and from intercompany data published by professional organizations such as the Society of Actuaries. Basic mortality data is adjusted as necessary to meet legal, regulatory, or competitive constraints imposed upon the company. The charges must also be consistent with the company's desired profit margins for the particular product under consideration.

For indeterminate premium products, a full schedule of current and anticipated premium rates is developed at the point of issue. Premium rate adjustments are considered when anticipated future experience foretells deviations from the original profit standards. The source of deviation (mortality, persistency, expense, etc.) is an important consideration in the rerating decision as well as the potential effect of a rate change on the future experience of the existing block of business.

Current expense loading charges anticipated are developed at the point of issue. Adjustments are considered when anticipated future experience foretells deviations from the original profit standards. The source of deviation (mortality, persistency, expense, etc.) is an important consideration in the adjustment decision as well as the potential effect of a change on the future experience of the existing block of business.

Experience rated group annuity contracts are credited with interest, retrospectively, in accordance with the investment year method.

For Universal Life and interest sensitive whole life contracts, credited interest rates are reviewed at least monthly. These are adjusted as necessary to meet regulatory or competitive constraints, as well as being consistent with the company's desired profit margins for the particular product under consideration.

For group annuity contracts, declared interest rates are determined each month on a portfolio average basis. Interest rates credited have been changed to reflect changes in yields of the underlying investments and current and anticipated market and product conditions.

## **INTERROGATORIES**

1. **Since this statement was last filed, have there been any changes in the values of nonguaranteed elements on new or existing business authorized for illustration by reporting entity?  If yes, describe the changes that were made.**

   RESPONSE:

   ADMS

   > No.  There are no policies which are authorized for illustration by ADMS.

   AFP

   > Yes.  Changes have been made to the nonguaranteed current interest rates credited and illustrated rates on certain interest sensitive  products for both new and existing business.

   ES&P

   > Yes.  Illustrated values on Bank Owned Life Insurance (BOLI) and Corporate Owned Life Insurance (COLI) sold by the Company reflect the actual interest rate being credited.  Actual credited interest rates have been changed to reflect changes in yields of the underlying investments and current and anticipated market and product conditions.

   TCM

   > Yes.  Credited rates determined by a portfolio average approach have been adjusted to reflect changes in the yield of the portfolio of assets backing the liabilities.

2. **Since this statement was last filed, have there been any changes in the values of nonguaranteed elements actually charged or credited?  If yes, describe the changes that were made.**

   RESPONSE: Yes.

   ADMS:

   > No changes.

   AFP

   > Yes.  Changes have been made to the nonguaranteed credited interest rates on certain interest sensitive products.  Also, nonguaranteed monthly deductions for certain interest sensitive life insurance policies were changed prospectively.

   ES&P

   > The nonguaranteed credited rates have been changed to reflect changes in yields of the underlying investments and current and anticipated market and product conditions.

   TCM

   > Yes.  Credited rates determined by a portfolio average approach have been adjusted to reflect changes in the yield of the portfolio of assets backing the liabilities.

3. **Indicate to what extent any changes described in 1 or 2 above vary from the policy and/or general methods and procedures last reported for the affected contracts.**

RESPONSE: No changes.

4. **Are the anticipated experience factors underlying any nonguaranteed elements different from current experience? If yes, describe in general terms the ways in which future experience is anticipated to differ from current experience and the nonguaranteed element factors which are affected by such anticipation.**

RESPONSE:

ADMS

Some indeterminate premium life policies have anticipated experience factors which vary from current experience.

All Other Divisions

Interest rates credited on a portfolio average approach reflect the recent historical experience of the underlying portfolio of assets. Interest rates credited on an investment generation approach are set with due consideration for asset turnover and anticipated reinvestment rates available over the guarantee period.

Anticipated investment experience cannot be predicted under any reasonable degree of certainty; therefore anticipated investment experience is expected to vary (either higher or lower) from current experience.

5. **State whether anticipated investment income experience factors are based on (a) a portfolio average approach, (b) an investment generation approach, or (c) other. If (b) or (c), describe the general basis used, including the investment generation groupings.**

RESPONSE: Both portfolio average and investment generation methods are used.

ADMS

A portfolio average approach is used.

AFP

Both the investment generation method and the portfolio method are used. Many universal life and deferred annuity policies credit interest on a portfolio average basis. A larger portion of universal life policies credit interest on a modified investment generation approach. The investment generation method is an attempt to credit interest equitably among policyholders by crediting the same interest rate to all premiums received on the same day on all in-force policies and new issues of the same policy forms.

ES&P

The investment generation method is used for Bank Owned Life Insurance (BOLI) and Corporate Owned Life Insurance (COLI) business. The Company's BOLI and COLI business is generally comprised of large, single premium cases. As such, the credited rate for each case is initially determined based on the asset yield at the time premium is received less a spread to cover the

company's profit and expenses. Renewal rates are reset annually. Reinvestment rates are estimated and tracked for each case. The renewal credited rate is then set based on the estimated asset yield on investments for each case less the credited rate spread. Each case represents its own investment generation grouping. For business not comprised of large, single premiums, premiums received are grouped by calendar quarter and investment rates are tracked by these groups rather than by case.

The majority of group annuity policies credit interest on a portfolio average basis. Renewal rates are reset monthly. For a small portion of group annuities, the contract fund is allocated by calendar year of deposit. There are eleven cells for the past ten years and the eleventh is an aggregation for earlier years. During a particular year of review, the assets in the General Account are segregated by year of acquisition, and the performance of each of the eleven cells is measured. Each of the contract holder's eleven cells will be credited with interest at a rate derived from the performance of the corresponding cell of assets in the General Account during the year of review.

For the universal life products, the investment generation method attempts to credit interest equitably among policyholders by crediting the same interest rate to all premiums received on the same day on all inforce policies and new issues of the same policy forms. Future cash flows including interest and rollovers of existing assets are assumed to be invested at the then new money interest rates. Existing assets are assumed to earn the same interest rate in the future as they are currently earning, until called, prepaid, or matured.

TCM:

Nearly all deferred annuity policies credit interest on a modified investment generation approach. The credited rate for new money is based on the asset yield at the time premium is received less a spread to cover the company's profit and expenses. Renewal rates are reset annually.

For group annuities, the contract fund is allocated by calendar year of deposit. During a particular year of review, the assets in the General Account are segregated by year of acquisition, and the performance of each is measured. The contract holder is credited with interest rates derived from the performance of the corresponding assets in the General Account.

6. **Describe how the reporting entity allocates anticipated experience among its various classes of business.**

RESPONSE:

AFP:

The company conducts periodic mortality and persistency studies where experience is differentiated by type of product and/or distribution. For nonguaranteed mortality charges, current experience is used as a guide for anticipated future experience. Functional cost studies are also performed to determine operational expenses, which are used as a guide for nonguaranteed expense charges.

All Other Divisions:

All of the classes have separate expense factors.

During product development, the anticipated cash flow of a product is analyzed under various future scenarios with respect to mortality, persistency, expenses, and interest rates. These cash flow studies together with experience studies are used to establish the schedule of mortality

charges and the investment spread necessary to support company profit and surplus objectives. In addition, an investment strategy is established for the product which assists investment personnel in meeting cash flow, yield, liquidity, quality, and asset duration standards appropriate for the product.

Interest rates credited are maintained at a level approximately equal to the earned rate on the supporting assets less the target spread determined in the initial product development or by subsequent actuarial investigation.   Regardless of the spread, interest rates are never less than the guaranteed interest rates in the policy forms.

For some annuity policies, a separate annuity portfolio is maintained within the Company's general account.

7.  **Does the undersigned believe there is substantial probability that illustrations authorized by the company to be presented on new or existing business cannot be supported by currently anticipated experience?  If yes, indicate which classes and explain.**

RESPONSE:

ADMS

No.  The company does not illustrate nonguaranteed elements.

All Other Divisions

Authorized illustrations can be supported by current experience. To the extent that interest rates are not predictable, there is a possibility that current illustrations are not supportable.

8.  **Describe any aspects of the determination of nonguaranteed elements not covered above that involve material departures from the actuarial principles and practices of the American Academy of Actuaries, applicable to the determination of nonguaranteed elements.**

RESPONSE:  There are no material departures from the actuarial principles and practices of the American Academy of Actuaries applicable to the determination of nonguaranteed elements.

## ACTUARIAL OPINION

I, Scott Hedgepeth, am an Assistant Vice President and Actuary in the AEGON Direct Marketing Services Division of Transamerica Life Insurance Company, and a Member of the American Academy of Actuaries. I have examined the actuarial assumptions and methods used in determining nonguaranteed elements for the life insurance and annuity policies of the AEGON Direct Marketing Services Division business within Transamerica Life Insurance Company used for delivery in the United States. The nonguaranteed elements included are those:

    i.     Paid, credited, charged, or determined in 2011; and

    ii.    Authorized by the Company to be illustrated on new and
          existing business during 2011.

My examination included such review of the actuarial assumptions and methods of the underlying basic records and such tests of the actuarial calculations as I considered necessary. In my opinion the nonguaranteed elements described above have been determined in accordance with generally accepted actuarial principles and practices applicable to the determination of nonguaranteed elements.

Scott Hedgepeth, F.S.A., M.A.A.A.
Assistant Vice President and Actuary
ADMS
January 9, 2012

## ACTUARIAL OPINION

I, Steven Cammarata, am a Risk Actuary in the Aegon Financial Partners Division of Transamerica Life Insurance Company, and a member of the American Academy of Actuaries. I have examined the actuarial assumptions and methods used in determining nonguaranteed elements for the interest sensitive life and annuity products of the Aegon Financial Partners Division used for delivery in the United States. The nonguaranteed elements included are those:

    i.     Paid, credited, charged, or determined in 2011; and

    ii.    Authorized by the reporting entity to be illustrated on new and existing business during 2011.

My examination included such review of the actuarial assumptions and methods of the underlying basic records and such tests of the actuarial calculations as I considered necessary. In my opinion, the nonguaranteed elements described above have been determined in accordance with generally accepted actuarial principles and practices applicable to the determination of nonguaranteed elements.


Steven Cammarata
Risk Actuary
Transamerica Life Insurance Company
1/31/2012

## ACTUARIAL OPINION

I, Paul Hance, FSA, MAAA, am a Vice President and Actuary in the Employer Solutions and Pensions Division of Transamerica Life Insurance Company, and a member of the American Academy of Actuaries. I have examined the actuarial assumptions and methods used in determining nonguaranteed elements for the universal life contracts, BOLI/COLI contracts, group annuity contracts and 401K plans of the Employer Solutions and Pensions Division used for delivery in the United States. The nonguaranteed elements included are those:

    i.       Paid, credited, charged, or determined in 2011; and

    ii.      Authorized by the reporting entity to be illustrated on new and existing business during 2011.

My examination included such review of the actuarial assumptions and methods of the underlying basic records and such tests of the actuarial calculations as I considered necessary. In my opinion, the nonguaranteed elements described above have been determined in accordance with generally accepted actuarial principles and practices applicable to the determination of nonguaranteed elements.


Paul Hance, FSA, MAAA
Vice President and Actuary
Transamerica Life Insurance Company
Employer Solutions and Pensions Division
1150 S Olive St., T-07-01
Los Angeles, CA 90015
(213) 742-2022

January 9, 2012

## ACTUARIAL OPINION

I, Ronald E. Hauser, am a Senior Actuary in the Transamerica Capital Management division of Transamerica Life Insurance Company, and a member of the American Academy of Actuaries. I have examined the actuarial assumptions and methods used in determining nonguaranteed elements for the deferred annuities of the company's Transamerica Capital Management used for delivery in the United States. The nonguaranteed elements included are those:

     i.     Paid, credited, charged, or determined in 2011; and

     ii.    Authorized by the reporting entity to be illustrated on new and existing business during 2011.

My examination included such review of the actuarial assumptions and methods of the underlying basic records and such tests of the actuarial calculations as I considered necessary. In my opinion, the nonguaranteed elements described above have been determined in accordance with generally accepted actuarial principles and practices applicable to the determination of nonguaranteed elements.


Ronald E. Hauser, FSA, MAAA
Senior Actuary
Transamerica Life Insurance Company
January 19, 2012



### TRANSAMERICA®
#### LIFE INSURANCE COMPANY

Administrative Office | 4333 Edgewood Road, NE | Cedar Rapids | Iowa 52499

G & M Zacharia Trust
George & Margaret
8751 Terrace Dr
El Cerrito, CA 94530-2724

October 19, 2015

Dear G & M Zacharia Trust:

Re: Notice of Monthly Deduction Rate Increase for 92332828

We are making a change that affects the universal life insurance policy that you purchased from Transamerica on 12/20/1990. This change impacts future payments you may need to make under the terms of the policy. We wanted to let you know about it as soon as possible, so you can evaluate your coverage and decide what you want to do. After you read this letter, we encourage you to **contact us toll free at 1-844-987-0897.** We have a special team of experts standing by who can talk you through the options, answer questions and assist with next steps. Please see below for hours of operation.

### *What's Changing and Why*
Once a month, Transamerica withdraws a "monthly deduction" from the policy's accumulation value. The factors that affect monthly deduction rates are outlined in your policy. **Starting on your next policy anniversary date, your monthly deduction rates will increase by approximately 38%.** For an estimate of your new monthly deduction for the coming policy year, please contact us at 1-844-987-0897.

We are increasing the monthly deduction rates for all TransMax policies based on our current expectations regarding our future costs of providing this coverage. After this change goes into effect, your monthly deduction rates will still be below the maximum rate allowed by your policy.

However, this increase could be significant. You have several options, which are described below. We value the relationship we have with you. We know this insurance is important to you, and want to work with you to keep coverage in place. We'll start by providing current information about your policy.

### *Policy Information*
This information about your policy is as of 8/20/2015.

Last policy anniversary: 12/20/2014
Face amount: $250,000
Current accumulation value: $22,262.98
Current cash value (minus any policy loans): $22,262.98

A0000399

EXHIBIT F

### Your Options

1. **Surrender Value Option**
   You may choose to surrender your policy for the cash value as of the date we receive your surrender request.  You can take this in cash or you may be able to exchange it for another life insurance policy that accumulates cash value—either with us or another carrier.

   The decision to surrender your policy should not be taken lightly and without consulting your tax, insurance and/or financial advisors.

2. **Reduced Face Amount Option**
   You may have the ability to decide how much premium you want to pay and for what duration you wish to keep the policy in force.  If so, we can reduce the face amount to the level supported by that premium - assuming it's above any minimum face amount.  If this option is of interest to you, please contact us at the number below to request an illustration based on your preferred premium.

3. **Retaining the Current Face Amount Option**
   You may choose to take no action.  With this option, you would maintain your policy at the current face amount after the monthly deduction increase.  However, at some point, you may need to pay additional premiums in order to keep the policy in force.  The best way to evaluate this option is to request an illustration so that you can see how the policy could change, depending on the premiums paid.  Please note that we will only alter your planned premium if you direct us to do so.

   When you call our team of experts at 1-844-987-0897, you can request an illustration and learn whether there are additional options available to you, based on your specific policy.

### What to Do Next

We understand you need to consider your choices very carefully.  We encourage you to contact us directly and toll free at 1-844-987-0897, Monday through Friday, from 8:00 am until 6:00 pm, Central Time, or you can contact your insurance representative.  It's also important that you discuss your policy and insurance needs with your own advisors, as we cannot offer tax or legal advice.  You are welcome to include your personal financial advisor on the call when you contact us.

**For more information, please call us at 1-844-987-0897, Monday – Friday from 8:00 am – 6:00 pm, Central Time.**

CC: 893513



**TRANSAMERICA®**
LIFE INSURANCE COMPANY

Administrative Office | 4333 Edgewood Road, NE | Cedar Rapids | Iowa 52499

Gordon Feller
1723 41st Ave
San Francisco, CA  94122-4001

July 16, 2015

Dear Gordon Feller:                                         Re: Notice of Monthly Deduction Rate
                                                            Increase for 92291114

We are making a change that affects the universal life insurance policy that you purchased from
Transamerica on 9/13/1989. This change impacts future payments you may need to make under the
terms of the policy. We wanted to let you know about it as soon as possible, so you can evaluate your
coverage and decide what you want to do. After you read this letter, we encourage you to **contact us
toll free at 1-844-987-0897.** We have a special team of experts standing by who can talk you through
the options, answer questions and assist with next steps. Please see below for hours of operation.

### *What's Changing and Why*
Once a month, Transamerica withdraws a "monthly deduction" from the policy's accumulation value.
The factors that affect monthly deduction rates are outlined in your policy. **Starting on your next policy
anniversary date, your monthly deduction rates will increase by approximately 38%.** For an estimate
of your new monthly deduction for the coming policy year, please contact us at 1-844-987-0897.

We are increasing the monthly deduction rates for all TransMax policies based on our current
expectations regarding our future costs of providing this coverage. After this change goes into effect,
your monthly deduction rates will still be below the maximum rate allowed by your policy.

However, this increase could be significant. You have several options, which are described below. We
value the relationship we have with you. We know this insurance is important to you, and want to work
with you to keep coverage in place. We'll start by providing current information about your policy.

### *Policy Information*
This information about your policy is as of 6/13/2015.

Last policy anniversary: 9/13/2014
Face amount: $500,000
Current accumulation value: $50,333.10
Current cash value (minus any policy loans): $50,333.10

EXHIBIT G      A0000284